FRED PAUL, PLAINTIFF-APPELLANT, v. BALTIMORE UPHOLSTERING CO., RESPONDENT-RESPONDENT, AND TWO PERCENT FUND, RESPONDENT-APPELLANT.

Argued October 8, 1974—Decided November 15, 1974.

112

114

*Mr. Charles J. Farley, Jr.* argued the cause for plaintiff-appellant Fred Paul (*Messrs. Farley & Farley,* attorneys).

*Mr. Lawrence G. Moncher,* Deputy Attorney General, argued the cause for the respondent-appellant Second Injury Fund (*Mr. William F. Hyland,* Attorney General, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Mr. Steven A. Tasher,* Deputy Attorney General, on the brief).

*Mr. Gerald W. Conway* argued the cause for respondent-respondent Baltimore Upholstering Co. (during coverage of

Employers Mutual Liability Insurance Company of Wisconsin) (*Messrs. Conway, Reiseman & Michals,* attorneys).

*Messrs. O'Brien, Brett, Holly & Martin* filed a brief on behalf of respondent-respondent Baltimore Upholstering Co. (during coverage of Firemen's Fund American Insurance Company).

The opinion of the court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. The Second Injury Fund (known at times in the past as the One Percent Fund and the Two Percent Fund, and hereinafter referred to as the Fund) created by the Legislature from contributions by employers to absorb in certain cases of permanent and total disability part of the impact on employers of awards of workmen's compensation, *L. 1923, c.* 81, as amended at various times thereafter (now *N. J. S. A.* 34: 15–94, 95, 95.1), seeks review in this court of the imposition of partial liability upon it by the Appellate Division in respect of claims for compensation by Fred Paul for accidental disability arising out of his employment by Baltimore Upholstering Co. ("Baltimore")

On November 25, 1969 Paul suffered his fourth myocardial infarction, all in the course of employment by Baltimore as an operator and tufter in its upholstering plant. The first one occurred in February 1966. For this he was awarded partial permanent disability of 25% of total. Two additional infarctions in July and December 1966 resulted in another partial permanent disability award of 25% of total. In late 1967 Paul returned to work for Baltimore and continued there (except for a three-month interval in early 1969 when he was ill with coumadin[1] poisoning) until Novembr 25, 1969, at which time he experienced severe chest pains while lifting a piece of furniture at work. The pains

---

[1]Coumadin is a blood thinner prescribed to avert myocardial infarctions.

persisted, and Paul received medical attention, being hospitalized about a week later. He has not been able to work since the November 1969 incident because of severe "heart" symptoms.

The original 25% award was entered against Firemen's Fund American Insurance Company ("Firemen's Fund") and the second against United States Fidelity & Guaranty Company ("U. S. F. & G."), which were respectively on the risk when the several prior infarctions occurred. In November 1969 Baltimore was covered by Employers Mutual Liability Insurance Company of Wisconsin ("Employers Mutual"), which is the real adversary of the Fund in this litigation.

Paul filed another claim petition for compensation in the Division of Workmen's Compensation after his 1969 infarction, based thereon, claiming total and permanent disability. Employers Mutual filed an answer and brought in as respondents to that proceeding the two carriers on the prior coverage and also the Fund. Judge of Compensation Saland found Paul to be totally and permanently disabled as a result of the November 1969 heart attack. He dismissed the claim of Employers Mutual against the Fund on the ground that the latter attack "aggravated and accelerated" the prior coronary disability "to the extent that [Paul] is now totally and permanently disabled." See *N. J. S. A.* 34:15–95(b). The judge held U. S. F. & G. liable for 12 weeks of temporary disability for the coumadin poisoning and Employers Mutual for 450 weeks of compensation at $83.33 per week, less $11,000 in awards paid by the prior carriers, and he dismissed the claim against Firemen's Fund.

On Employers Mutual's appeal to the Appellate Division that tribunal in an unreported *per curiam* opinion held:

(1) the trial holding that the incident of November 1969 aggravated and accelerated the pre-existing coronary disability, thus rendering the total disability chargeable to the employer alone, was unjustified. The medical proofs compelled a conclusion that the said incident was the cause of

only some partial permanent disability, which when com-bined with and superimposed upon the partial permanent disability previously existing rendered the workman totally and permanently disabled. In such a situation the employer is responsible only for the disability attributable to the incident of November 1969 and the Fund is responsible for the remainder of the permanent total disability, subject to credit for the amounts awarded on the earlier claim petitions. The court directed a remand to the Division of Workmen's Compensation for allocation of the respective percentages of disability as between the employer and the Fund;

(2) because of the differential between the statutory maximum weekly rates for partial permanent disability ($40.00) and those for total permanent disability (as to this employee, $83.33), the deductions allowable for the earlier awards are to be calculated on the basis of dollars awarded rather than according to the number of weeks for which such awards were granted;

(3) the present award is payable beginning after the payment of the last installment of the previous awards for partial permanent disability, not before.

Paul and the Fund sought certification, which was granted. 65 N. J. 556 (1974). Although Paul's financial stake in the Appellate Division decision extends only to the delay in receipt of current compensation at full total permanent disability rates, see IV, infra, he also assails the decision that the Fund is responsible for any part of the liability of 450 weeks (less credits for previous payments). He maintains that liability therefor is solely the responsibility of the carrier, while that of the Fund will begin at the expiration of that period, for such extended payments as may become due the workman under N. J. S. A. 34:15-12(b) (disability of the workman after the 450 weeks notwithstanding rehabilitation efforts to earn wages equal to those earned at the time of the accident).

The Attorney General on behalf of the Fund argued before the Appellate Division for an affirmance of the judgment

of the Division of Workmen's Compensation relieving the Fund of liability. In his petition here, however, assuming the Fund is liable, he attacks the holding of the Appellate Division that the employer's share of the joint liability is to be measured at the maximum partial disability rate of $40 provided for in *N. J. S. A.* 34:15-12(c) rather than at the maximum total disability schedule set forth in *N. J. S. A.* 34:15-12(b).

## I

The initial issue presented for determination is whether the Appellate Division erred in overruling the holding of the Judge of Compensation, in effect, that the permanent total disability following the November 1969 infarction resulted from an aggravation and acceleration by that episode of the previous coronary disability of the workman. If so, it will then be necessary to determine whether, as a matter of law, such a finding of aggravation and acceleration leads to relieving the Fund of liability, as decided by the Judge of Compensation, even though the prior disabilities were compensable.

## A

The Appellate Division was required to affirm the finding of fact mentioned above if that finding could reasonably have been reached on sufficient credible evidence present in the whole record, giving due weight to the expertise in the field of the Judge of Compensation and his opportunity of hearing and seeing the witnesses. *De Angelo v. Alsan Masons, Inc.,* 122 *N. J. Super.* 88, 89 (App. Div.), aff'd o.b., 62 *N. J.* 581 (1973). Our own review of the record leads us to conclude that application of the stated test called for an affirmance of the trial finding of aggravation and acceleration.

Dr. Saul Lieb, a specialist in internal medicine, was called as an expert witness for Paul. On the basis of the

hospital records, Dr. Lieb testified that Paul had been admitted to the hospital on December 10, 1969 with a final diagnosis of arteriosclerotic heart disease and acute coronary insufficiency. The doctor also stated that the hospital's electrocardiograms indicated that Paul had suffered an acute myocardial infarction on November 25, 1969. Dr. Lieb had initially examined Paul in August 1966, when he estimated his disability from the first coronary to be permanent and to amount to 50% of total. He saw the patient again in August 1966 and on March 23, 1967 after the second and third infarctions, respectively, and had then concluded that Paul was permanently disabled to the extent of 75% of total. Dr. Lieb's subsequent examination on February 27, 1970 led him to a conclusion that Paul was now 100% permanently disabled. The increased disability was attributed to the episode of November 25, 1969. The coumadin poisoning was no factor in the ultimate disability. He also opined that Paul's condition was causally related to his work.

The testimony on aggravation and acceleration was developed on cross-examination of Dr. Lieb on behalf of the Fund and Employers Mutual. While at one point he answered in the affirmative a question as to whether his "diagnosis of coronary insufficiency and probable myocardial infarction" of 1969 "combined with" the pre-existing pathology to cause the man "to be 100% of total", he said Paul's coronary condition had stabilized prior to the last infarction, and he responded in the affirmative to an inquiry whether the "last incident" aggravated the coronary or cardiac disability. He explained that it increased it. He also answered affirmatively an inquiry as to whether the last incident in any way "did aggravate, activate, accelerate any of the previous disabilities from infarctions or insufficiencies that [Paul] suffered". He explained, on further cross-examination: "The heart is one organ; it is not separate. While the incidents were separate, they occurred in the same person in the same organ."

Dr. Sanford Lewis, also a specialist in internal medicine and cardiology, testified for Employers Mutual. As a result of an examination of Paul on July 14, 1970 he concluded that he had arteriosclerotic coronary artery disease with multiple episodes of myocardial infarction and coronary insufficiency. This rendered him disabled to the extent of 75% of total. Dr. Lewis stated that Paul's infarction on November 25, 1969 did not cause him any permanent disability. Rather, the 25% increase in disability since the prior awards of 50% of total was solely attributable to petitioner's increased age. In addition, the doctor was of the opinion that the man was still able to do sedentary work.

Dr. Jack S. York, also a specialist in internal medicine and cardiovascular disease, testified for U. S. F. & G. He examined Paul on November 14, 1967 and on March 22, 1972. Dr. York stated that he was 100% permanently disabled as a result of his medical history of heart trouble. The attack of November 29, 1969 did not aggravate the prior condition but rather added to the already existing problem. He concluded that the patient had no residual effects from the coumadin poisoning.

Judge Saland credited Dr. Lieb's testimony as to the November 1969 incident having aggravated Paul's earlier condition after an intervening period in which he had been a "competent working unit." He rejected the hypotheses of Doctors Lewis and York as "unrealistic and medically improbable." He expressly found that "as a result of the attack in November 1969 [Paul's] coronary disability was aggravated and accelerated to the extent that he is now totally and permanently disabled."

We conclude it was within Judge Saland's province, under the proper limits of the rule of judicial review stated above, to accept the opinion of Dr. Lieb and reject those of the opposing physicians not only as to the extent of Paul's ultimate disability (permanent-total) but also as to whether that ultimate disability resulted from an aggravation or acceleration of the pre-existing disease. There was a sufficient,

credible basis in the testimony for the judge's affirmative finding on that question. None of the parties disputes on this appeal the invulnerability of the finding of ultimate total permanent disability, and of course the Appellate Division so found.

B

Were it not for the language of paragraph (b) of *N. J. S. A.* 34:15–95, the statute before us, we would entertain no doubt that the comprehensive construction of the Fund act in cases like *Balash v. Harper,* 3 *N. J.* 437, 442 (1950) and *Wexler v. Lambrecht Foods,* 64 *N. J. Super.* 489 (App. Div. 1960), certif. den. 34 *N. J.* 326 (1961), calls for the legal result of Fund immunity where the injury from the later employment-connected accident aggravates or accelerates the injury or condition attendant upon the prior accident, whether or not the prior injury was *compensable.*

Paragraph (b), added along with three other express exceptions to Fund liability by amendment of the act in *L.* 1940, *c.* 133, excludes liability of the Fund,

"(b) If permanent total disability results from the aggravation, activation or acceleration, by the last compensable injury, of a pre-existing *noncompensable* disease or condition. (emphasis added).

Although no one in this case has seriously argued the point, the question arises in our mind, *cf. Ort v. Taylor-Wharton Co.,* 47 *N. J.* 198, 204, 205 (1966), whether the allusion in paragraph (b) to "pre-existing noncompensable disease or condition" justifies an inference that the Legislature intended thereby that the Fund was not to be immune from contribution if total permanent disability resulted from aggravation, acceleration, etc., by the last accident of a pre-existing *compensable* disease or condition, as in the present case. We think it in the public interest that we settle the question. We consequently proceed to explain our conclusion that a proper construction of the act as a whole does not warrant the inference of legislative intent just posed.

■ First, it is noteworthy that this court long ago summarized the purpose and object of the statute in terms of exclusion of Fund liability where there was a causative connection between the injury or condition occasioning the compensable disability and the results of the prior disability without qualification as to the status of the prior disability as compensable or otherwise. See *Balash v. Harper, supra,* where the court said, in a carefully considered *dictum,* (3 *N. J.* at 442):

> The test of the applicability of the "One Per Cent Fund" is (a) that an employee has become totally and permanently disabled when a compensable disability is superimposed upon a prior disability, *whether compensable or not,* and (b) that the prior disability is one for whose results the subsequent disability has not been a competent producing cause as by aggravation, activation or acceleration. If the last compensable accident produces an aggravation, activation or acceleration then any progression in the pre-existing condition is attributable and is part of the last compensable accident. *Cf. Richardson v. Essex National Trunk & Bag Co.,* 119 *N. J. L.* 47 (E. & A. 1937); *Voessler v. Palm Fetchteler & Co.,* 120 *N. J. L.* 553 (Sup. Ct. 1938) *In re Glennon,* 18 *N. J. Misc.* 196 (Essex Pleas 1940). (emphasis added)

The foregoing formulation has been frequently recognized by our courts as authoritative. *Wexler v. Lambrecht Foods, supra* (64 *N. J. Super.* at 501); *Belth v. Anthony Ferrante & Son, Inc.,* 88 *N. J. Super.* 9, 16 (App. Div. 1965), aff'd 47 *N. J.* 38 (1966); *In re Malinowski v. Male,* 78 *N. J. Super.* 458, 463–464 (Cty. Ct. 1963); *Schulman v. Male,* 70 *N. J. Super.* 234, 244 (App. Div. 1961).[2]

---

[2] Distinguish such a case as *Mayti v. Male,* 59 *N. J. Super.* 478 (Cty. Ct. 1960), aff'd 79 *N. J. Super.* 554 (App. Div. 1963), holding that paragraph (b) is not applicable when the prior disability is due to more than one abnormality, one of which is aggravated by the later accident and the other not, although a substantial factor in producing the permanent total disability.

The facts in the instant case do not call for an expression by us as to the soundness of the *Mayti* holding. The general sclerotic condition from which Paul suffered prior to the last infarction would not qualify as a prior partially and permanently disabling condition, as

Significant evidence of the kind of separateness between the prior and later (employment-connected) accidental disabilities which the Legislature probably had in mind as a prerequisite for Fund liability in enacting the legislation in the first place is found in the case of *Combination Rubber Mfg. Co. v. Obser*, 95 *N. J. L.* 43 (Sup. Ct. 1920) aff'd o.b. 96 *N. J. L.* 544 (E. & A. 1921). That decision was later attributed by the Court of Errors and Appeals as the probable reason for the enactment not long thereafter of the first fund liability act in 1923. *Richardson v. Essex National Trunk, etc., Co., Inc.,* 119 *N. J. L.* 47, 51–52 (1937).

In *Obser* it was held that an award for total permanent disability would be entered against an employer who took into his employ a one-eyed workman who lost the remaining eye in an employment-connected accident. By enacting the Fund statute the Legislature sought to encourage employers to hire handicapped or partially disabled people, secure in the knowledge that if total permanent disability occurred in employment because of the coincidental effect of the prior disability and the accidental disability in the employment the employer would not have to pay for the completely disparate disability which the workman originally brought with him to the job. *Richardson, supra* (119 *N. J. L.* at 53). Even prior to the adoption of the 1940 amendment with its exculpatory subparagraphs (a), (b), (c) and (d), the Essex County Court, in a carefully reasoned opinion by Judge Hartshorne, recognized that the intent of the act was to impose upon the Fund liability only where the later compensable disability "has no causative connection with, the results of" the prior disability even though the combination of the two disabilities left the employee permanently and totally disabled. *In re Glennon,* 18 *N. J. Misc.* 196, 197, 12 *A.* 2d 360 (1940). In language substantially appropriated by this court for its opinion in *Balash v. Harper, supra* (3 *N. J.* at 442),

it was not then "fixed, measurable and arrested," see *Ort v. Taylor-Wharton Co., supra,* 47 *N. J.* at 204–205. See also *Wexler v. Lambrecht Foods, supra,* 64 *N. J. Super.* at 505–506.

the Essex Court said, 18 *N. J. Misc.* at 197, the purpose of the act was "to relieve the employer of the undue burden of a prior disability, *with which, or its results,* the disability arising in his employ had no causative connection, but which burden the previous broad provisions of the Workmen's Compensation Act were found to impose upon him." (emphasis added).

The foregoing rationale would seem to bar Fund liability where there is a physiological or pathological causal effect by the prior injury or condition operating upon the later, or vice-versa. See *Wexler v. Lambert Foods, supra* (64 *N. J. Super.* at 505); *Vaccaro v. Walter Kidde and Co.,* 134 *N. J. L.* 491 (Sup. Ct. 1946). This has been the general understanding of the Fund section ever since. *Berkowitz, Workmen's Compensation* (1960) p. 229; *Report, New Jersey Workmen's Compensation Study Commission* (1973) pp. 38–41.

A possible clue to the purpose of the adoption of the exculpatory paragraphs of Section 95, particularly (b), by the 1940 amendment (which became effective June 18, 1940), may be found in the decision of the Court of Errors and Appeals on April 25, 1940 in *Toohey v. Gorman,* 125 *N. J. L.* 41, affirming the (former) Supreme Court judgment reported in 123 *N. J. L.* 235 (1939). There the court held the Fund liable for payments to a workman beyond the statutory 400 weeks for total permanent disability (under the extended payment provisions of *N. J. S. A.* 34:15–12b.) when the original award was against the employer for 75% partial permanent disability on the basis of an employment-connected fracture of the hip-bone which failed to heal because of a previous underlying Paget's disease. The Fund liability (which could continue for the employee's lifetime) was pegged to a finding in the (former) Court of Common Pleas of a 25% pre-existing disability constituted by the Paget's disease. Since there was an obvious physiological causal connection between the previous disease and the unhealed bone fracture eventuating in the total permanent disability in that case, the Legislature may have deemed the entire ultimate dis-

ability in such a case fairly the burden of the employer alone, consistent with the rationale of the *Glennon* case, *supra,* and have therefore been motivated to prevent any further such impositions on the Fund by the adoption of the 1940 limitations of liability of the Fund.[3]

■ Further indication of a legislative purpose for discreteness of the earlier and later conditions, in relation to each other, as a basis for Fund liability, is found in that paragraph of the 1940 amendment of the act, immediately following paragraphs (a), (b), (c) and (d), which states:

"Nothing in the provisions of said paragraphs a, b, c and d, however, shall be construed to deny the benefits provided by this section to any person * * * who in successive accidents has suffered compensable injuries, each of which, *severally,* causes permanent partial disability, but which in conjunction result in permanent total disability." (emphasis added).

As was noted in *Vogel v. Red Star Express Lines,* 73 *N. J. Super.* 534, 543 (App. Div. 1962), aff'd 40 *N. J.* 44 (1963), the word "severally" in this regard means, "distinctly, separately, apart from others." Thus further force is lent the hypothesis, in effect accepted by our courts since *Balash v. Harper, supra,* that the earlier and later conditions not be aggravative, activative or accelerative, physiologically, one of the other, if the Fund is to be implicated.

---

[3]Legislative history is not too helpful. The short "Statement" of purpose appended to Assembly Bill No. 284 of 1940 which in amended form became *L.* 1940, *c.* 133, contains no allusion, express or implied, to the purpose of the excepting paragraphs (a), (b), (c) and (d). The version of (b) in the bill was somewhat different from that of the committee substitute — that finally adopted — in that, *inter alia,* the former did not refer to the prior condition or disease as "noncompensable". However, the drafters may well have been specially concerned with specific cases where Fund liability had been adjudicated in relation to prior, causally related conditions which were in fact noncompensable, as in *Toohey v. Gorman, supra.* This would be a weak basis for necessarily inferring intent to render the Fund liable where the prior, causally related condition was compensable. See *infra, passim.*

Certain expressions in our opinion in *Ort v. Taylor-Wharton, supra* (47 *N. J.* 198), require comment in relation to the present discussion. In that case the workman was exposed to industrial dust over many years, and on a petition filed in 1956 was awarded 30% of total permanent disability on a finding of incapacity which was "fixed, measurable and permanent". He returned to work, and in February 1961 filed a petition for increased disability asserting total and permanent disability and that the additional exposure had imposed "an additional and independent disability on the already existing and fixed 30%", creating a "further 70% which in combination produced total and permanent incapacity". (47 *N. J.* at 202). The compensation judge made findings of fact accordant with the allegations of the petition, awarding the workman 100% permanent disability and allocating liability 30% to the carrier on the risk when the first exposure took place and 70% to the different carrier at the time of the subsequent exposure (including liability for extended payments after payment of 450 weeks of compensation). On appeal, the second insurer sought to hold the Fund for liability for the extended period. This court held that the matter should be remanded to bring in the Commissioner of Labor and Industry as a party to defend the claim against the Fund (47 *N. J.* at 203), but it then undertook a discussion of considerations which might be pertinent on the remand (*Id.* at 204–207).

In that discussion the court noted that paragraph (b) of section 95 was not specifically applicable to the situation for two reasons: (1) the earlier exposure was compensable; and (2) the later disability did not result from aggravation of the earlier but was "independent" and had "attached itself" to a previous disability adjudicated to have been "measurable, fixed and arrested." (47 *N. J.* at 204). The court implied that in such a situation the Fund might well be liable for any compensation due after 450 weeks. As to that much of the opinion, we remain in accord. The *Ort* facts as judicially

found represent a situation of absence of causal connection, physiologically, between the later and earlier conditions.

However, the implication in the extended discussion on page 205 of the *Ort* opinion of potential liability of the Fund in a purely hypothetical case of two successive accidents, both injurious to the lungs of an employee, with an "aggravation" by the second accident of the pre-existing lung condition resulting from the first accident, was not based on the facts before the court for adjudication. It does not in our present view represent a persuasive basis for departing from the long-settled understanding of Section 95 expressed by the court in *Balash v. Harper, supra* (which was not cited in *Ort*), and in the subsequent cases which have accepted its authority, without the intervention of any pertinent change in the statute since that time.

The core question activated by the reference in paragraph (b) of Section 95 to "pre-existing noncompensable disease or condition" is whether there is any discernible rationale in the policy and background of the statute supporting a view that while the Legislature would not want Fund liability where the last injury aggravates, activates or accelerates a *noncompensable* pre-existing disease or condition it nevertheless would intend such liability if the pre-existing disease or condition were *compensable*. None suggests itself or has been suggested to us. In a proper case the Fund can be liable whether the pre-existing condition arises from a compensable or a noncompensable accident. *Richardson v. Essex National Trunk, etc., Co., Inc., supra* (119 *N. J. L.* at 52). The only practical difference to the Fund between the two situations is that it would receive a credit against its obligation for any award made to the employee for a prior compensable disability. *N. J. S. A.* 34:15–12 subd. d. That difference has no relevance to the rationale of a statutory policy of denying the employer Fund relief when the ultimate total permanent disability is the product of aggravation, activation, etc. by the later injury of the earlier condition. The statutory policy

appears equally apposite whether the earlier incident is compensable or not.

■ ■ While we are, as we should be, cognizant of the general policy of the statute to encourage the hiring by industry of people handicapped by pre-existing disabilities, the Legislature has manifested concern that the Fund not be subject to undue invasion (*e.g.*, liability ensues only upon ultimate total permanent disability). The interests here in opposition are employers and insurers, and the State Fund; not employers or insurers versus employees. We are fully satisfied that against the background of past legislative and judicial treatment of the specific subject matter before us, as developed above, our holding here should be, and it is, that the Fund is not liable for participation in the discharge of the workman's award, the later heart episode having aggravated and accelerated the earlier condition to bring about total and permanent disability.

## II

■ In the Appellate Division, assailing a determination by the Division of Workmen's Compensation of sole responsibility for the permanent and total disability, Employers Mutual complained that the Division, in crediting it for the prior awards aggregating 50% of total permanent, had fixed the credit in terms of dollars of award ($11,000, at $40 per week for 275 weeks; the statute provides for the percentage of partial total disability to be translated into a corresponding portion of 550 weeks, *N. J. S. A.* 34:15–12, subd. c, par. 22). It was Employers Mutual's position that the pertinent section, *N. J. S. A.* 34:15–12, subd. d, calls for a credit of the number of *weeks,* not dollars, represented by the prior award. Acceptance of this position would benefit the carrier and by the same token harm the employee since the weeks of the prior partial award were admeasured at the $40 per week partial permanent rate while the weeks of the later total permanent award are payable at the higher rate of $88.33 per week.

Since we have affirmed the Division holding dismissing the claim against the Fund, Employers Mutual is entitled to a determination of this question. In the Appellate Division, where the impact of the issue in question fell upon the Fund, not the employer, the credit was held measurable in terms of the prior dollar awards rather than in terms of weeks of disability.

On this question we conceive the Appellate Division to have been correct. The statute requires the employer or his carrier to be given credit "to the extent of the previous loss for which compensation has been paid." It seems to us totally inconsistent with the beneficent interpretation of the compensation act to which an injured worker is entitled to say that a subsequent award of total permanent disability, required by the act to be paid at the higher weekly rates fixed for such a disability, was intended to be permitted to be watered down by devaluing the statutory period of weeks due therefor through a credit against that number of weeks of the lower-rated weeks of the former partial permanent award to the employee. The net result of such an approach would be nothing less than the denial to the workman of the full measure of the total permanent disability award adjudicated in his favor by the Division of Workmen's Compensation.

Employers Mutual cites in support of its position *Nelson v. Meeker Foundry Co.,* 30 *N. J.* 139 (1959). There the petitioner had in 1931 sustained an injury resulting in the loss of three fingers of the left hand for which he was awarded and paid 135 weeks of compensation at the scheduled rate for loss of digits. In 1952 he lost his fourth finger of the hand in an accident, resulting in an impairment of his left hand equivalent to 100% loss of such member. The court held the petitioner entitled to an award for the statutory scheduled loss of the hand, but credited the employer for the number of weeks previously allowed for the loss of the digits, which, Employers Mutual tells us, had been compensated for at the maximum rate obtaining in 1931 — one much lower than the maximum in effect in 1956. However,

the difference in rates was not noted in the opinion of the court nor was there any indication therein that the employee argued for restriction of the employer's credit to dollars of prior award rather than weeks. It thus does not appear that the issue we are resolving here was faced by the court in *Nelson,* and we do not regard the opinion as standing in the way of the eminently just result we are arriving at here on the facts before us.

Employers Mutual will be allowed a credit for the $11,000 paid Paul in the prior awards, not for the weeks of prior awards against the weeks due for the current total, permanent disability.

### III

In directing apportionment of liability between Employers Mutual and the Fund on the basis of the "percentage of partial permanent disability which is found to have resulted from the incident of November 25, 1969" — a percentage to have been fixed on remand — the Appellate Division held that Employers Mutual would be liable for its proportionate share of 550 weeks at the *partial* permanent disability rate of $40 per week, with the balance of the total disability award of $37,498.50 (450 weeks at $83.33 per week) payable by the Fund. Both Paul and the Fund complain of this ruling. They contend that Employers Mutual should have been held at *total* permanent disability rates for the proper proportionate period of the 450 week statutory period.

As we have held there is to be no apportionment, the Fund not being liable at all, the issue posed does not have to be decided on this appeal. However, the Attorney General urges that we decide the question as the Appellate Division ruling is assertedly contrary to prior case law and administrative practice and is causing confusion in the field of Fund liability. We have therefore decided to deal with the matter.

*N. J. S. A.* 34:15–95 generally provides that Fund benefits are to be available "to persons totally disabled, as a result of

experiencing a subsequent permanent injury under conditions entitling such persons to compensation therefor, when such persons had previously been permanently and partially disabled from some other cause". The only language in the section at all relevant to the question of apportionment of the total disability obligation between the employer and the Fund is the provision that payment from the Fund "shall be made from the date when the final payment of compensation by the employer is or was payable for the injury * * * sustained in the employment wherein the employee became totally and permanently disabled". This language is debatably construable as relating merely to the chronology of payments. It is uninformative as to the *quantum* or rate of payments by either category of obligor. Equally unhelpful is the corresponding language in the previous statutory formulation (*L*. 1936, *c*. 55) which called for the Fund payment to "cover that portion of the period for which the employer is not legally responsible due to the permanent and partial disability suffered or possessed by the employee at the time that the employee sustained" the permanently disabling injury. *Cf. Svec v. Westfield Motor Sales,* 110 *N. J. Super.* 225, 231 (App. Div.), certif. den. 56 *N. J.* 478 (1970).

The statutory language being murky as to the legislative intent, we look to the decided cases for enlightenment.

This much has always seemed clear. Where the Fund is held liable, while the employee receives compensation for total permanent disability, the employer at the time of the second injury is liable "for *the percentage* of disability attributable to that injury" (emphasis added) and the balance of the award due the workman is payable by the Fund. *Nelson v. Meeker Foundry Co., supra* (30 *N. J.* at 144) ; and see *Vogel v. Red Star Express Lines, supra* (40 *N. J.* at 45). It seems to us almost self-evident that when we referred, in *Nelson, supra,* to a "percentage of disability" chargeable to the employer, we meant a percentage of the total permanent disability, payment for which was to be awarded the workman. Thus, if it were determined in the instant case that

50% of Paul's total permanent disability was attributable to the 1969 infarction and 50% to the earlier disabilities, a failure to charge the last employer for 50% of *what Paul is now entitled to receive* for the 450 weeks due for total permanent disability, and instead limiting the employer's liability to half the 550 weeks (the statuory measuring period for partial disability) at the substantially lower partial disability rate, would be in effect to load the Fund with more than its due 50% of the liability to the employee in favor of relieving the employer of its full 50% (putting to one side liability for the extended period beyond 450 weeks, concededly the obligation of the Fund in entirety).[4]

A similar contention was rejected by the Appellate Division in *Svec v. Westfield Motor Sales, supra* (110 *N. J. Super.* 225). In *Svec* the petitioner had suffered an injury to his eye. When combined with his pre-existing condition, this left petitioner totally disabled and implicated liability of the Fund. The respondent argued that its liability should be limited to the scheduled loss for an eye, as provided in *N. J. S. A.* 34:15–12(c), which was a $35 per week maximum, and that the Fund should be responsible for the difference between such scheduled award and the award for total permanent disability, at that time fixed at $40 per week. The court expressly rejected this argument and in so doing stated (110 *N. J. Super.* at 232–233):

Our ultimate conclusion that the employer must pay the additional $5 per week for the 200 weeks is not incompatible with the basic philosophy of the Fund legislation. Were it not for the Fund Act, as was demonstrated in *Belth v. Anthony Ferrante & Son, Inc., supra,* 47 *N. J.*, at 45–48, employers would continue to be, as they previously were, responsible for the entirety of the total and permanent disability consequent upon an accident at work even though the disability would not have been permanent and total had it not been for a

---

[4]It is implicit in what we are saying that we find totally without merit Paul's contention that in a Second Injury Fund case the Fund can never be held for anything but the extended period after the initial 450 weeks of total permanent disability.

previous partial disability not attributable to the employment. See *Combination Rubber Mfg. v. Obser*, 95 *N. J. L.* 43 (Sup. Ct. 1920), aff'd o.b. 96 *N. J. L.* 544 (E. & A. 1921). Respondent continues, notwithstanding today's decision of the present case, to retain the basic benefit of the Fund Act in that the Fund takes over liability for that period of disability (here, for the heart and nephritis conditions) distinct from the period of disability for the eye which is the exclusive responsibility of the employer. That it must pay for that period at the permanent and total rate does not undermine the basic benefit it retains under the Fund scheme.

We are in full accord with these expressions. We consequently hold that when the Fund is properly held liable for benefits in a given case, the employer's share of the award payable for the total permanent disability is at the adjudged percentage of its causal contribution to that disability applied to 450 weeks at the statutory rate for total permanent disability.

## IV

 Finally, we have to deal with Paul's complaint that Employers Mutual has wrongfully refused to account to him for the full total permanent disability rate of $83.33 for any part of the period prior to January 29, 1972, notwithstanding that, as a matter of law, it was liable at that rate after the temporary disability period (ending April 28, 1970) following the infarction of November 29, 1969 which was adjudicated to have produced a total permanent disability. Employers Mutual has resisted this claim, invoking the provisions of *N. J. S. A.* 34:15–16, which states that:

"Compensation for all classes of injuries shall run consecutively, and not concurrently * * * as follows: First, medical and hospital services and medicines as provided in said section 34:15–15. After the waiting period, compensation during temporary disability * * *. * * * Following both, * * * compensation consecutively for each permanent injury * * *."

See, applying the statute literally, *Ort v. Taylor-Wharton Co.*, *supra* (47 *N. J.* at 207–209).

Employers Mutual calls our attention to these facts. The obligations of the previous carriers for partial permanent disability payments at a maximum of $40 per week (which was the effective rate as to this particular workman) if paid weekly would not have expired until January 29, 1972. In fact, total payment of the prior awards was completed well prior to that date because the U. S. F. & G. voluntarily made its payments concurrently with those of Firemen's Fund still unpaid rather than exercise its right to withhold payment until Firemen's Fund had completed its due number of weekly payments. But Employers Mutual says the latter fact is irrelevant — under the statutory direction for consecutive payment of permanent injury awards it had no liability to begin its payments of total permanent disability until January 29, 1972, when the period of weeks for which the prior insurers were responsible would have expired. (It had already, as the statute required, paid for temporary disability).

Paul counters that the presumptive statutory object of adequately sustaining an injured workman during his incapacity cannot be squared with remitting him to maximum $40 partial permanent weekly payments during a period of time subsequent to his sustaining total permanent disability for which the Legislature has ordained that he is entitled to maximum $83.33 weekly payments. To avoid a period of multiple compensation, he suggests the second carrier be required to pay so much of its weekly obligation as to make up for the deficiency between partial disability and total disability rates during the period when a prior award of partial disability is being paid. ·

In *Ort, supra,* where the discussion of *N. J. S. A.* 34:15–16 was in a context assuming non-applicability of Fund liability (47 *N. J.* at 208), the question was simply whether a carrier obligated for a 70% partial permanent award was entitled to withhold payments until completion of payment of a prior award of 30% partial permanent. The court held in the affirmative, relying on the literal import of the statute

as quoted above. Since the weekly rates were the same under both awards, the case did not present the hardship posed the workman in the instant case arising from the sharp difference between partial permanent and total permanent maximum rates. Even if, in *Ort,* the earlier award had been for partial permanent disability and the later one for total permanent disability, the weekly difference in maximums at that time would have been only five dollars. See *L.* 1962, *c.* 57, Sec. 1.

While, therefore, the strict holding in *Ort,* as well as the literal import of the statute, would seem in cold logic to sustain Employers Mutuals' position here, our courts have not hesitated in the past to construe the workmen's compensation act so as to comport with its presumptive beneficent and remedial objectives favorable to injured workmen rather than to be bound by its coldly literal import. See, *e. g. Combination Rubber Mfg. Co. v. Obser, supra* ("the spirit should not be killed by the letter", 95 *N. J. L.* at 45) ; *Thornton v. Chamberlain Manufacturing Corp.,* 62 *N. J.* 235, 242 (1973) ; *Dawson v. Hatfield Wire & Cable Co.,* 59 *N. J.* 190, 196–197 (1971).

In this light, we cannot conceive the Legislature would intend an injured worker, adjudicated to be entitled to benefits for total permanent disability at a then controlling maximum weekly rate of $83.33, to be required to subsist for any substantial period of time at the weekly maximum of $40 then being paid to him for a prior partial permanent disability. No doubt it would violate the statutory intent against double weekly payments, see *Ort, supra* (47 *N. J.,* at 208–209), for both awards to be paid in full concurrently. However it would be fair and consonant with the clearly inferable intent of the Legislature as to how such a situation should be handled, had it been contemplated when the statute was drawn, for the subsequent carrier to be required, on notification by the employee of the facts, to pay so much of its weekly liability as would, together with the payments then being received under the prior award, equal the total permanent disability rate for which that carrier is responsible. We

so hold. The effect of our determination is not to increase the total dollar liability of the carrier, but only to accelerate its obligation for a portion of it.

In the present case, Employers Mutual having been on notice of the workman's claim in this regard pending this litigation, the matter is remanded to the Division of Workmen's Compensation for such adjustment of accounts between the parties as will cause the workman to have received from Employers Mutual what we are holding he should have been paid by that carrier before as well as after January 29, 1972, but without interest for any past due obligation of the nature discussed under this Point of the opinion.

Reversed and remanded to the Division of Workmen's Compensation for further proceedings conformable with this opinion.

*For reversal and remandment*—Chief Justice HUGHES, Justices JACOBS, HALL, SULLIVAN, PASHMAN and CLIFFORD and Judge CONFORD—7.

*For affirmance*—None.