680 A.2d 750

LODEAN SHEFFIELD, PETITIONER–APPELLANT, v. SCHERING PLOUGH CORPORATION, TRAVELERS INSURANCE COMPANY, LIBERTY MUTUAL INSURANCE CO., AND THE SECOND INJURY FUND, RESPONDENTS–RESPONDENTS.

Argued January 30, 1996—Decided August 9, 1996.

*Samuel E. Bass* argued the cause for appellant (*Freeman & Bass*, attorneys).

*Charles N. Martel* argued the cause for respondent Schering Plough Corporation (Travelers Insurance Company) (*Robert W. Frieland,* attorney).

*Edward C. Denner, Jr.,* submitted a letter in lieu of brief on behalf of respondent Schering Plough Corporation (Liberty Mutual Insurance Company) (*Robert G. Bressler,* attorney).

*Dolores M. McNamee,* Deputy Attorney General, submitted a letter in lieu of brief on behalf of respondent Second Injury Fund (*Deborah T. Poritz,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

STEIN, J.

This is a workers' compensation case. Petitioner, Lodean Sheffield, worked for respondent Schering Plough Corporation for over twenty years in positions that required repeated bending and lifting. In July 1983, Sheffield ceased work because of a disabling back condition. She did not file a claim for workers' compensation benefits until five and a half years after her back injuries rendered her unable to work.

The Workers' Compensation Act (Act), *N.J.S.A.* 34:15–1 to –128, establishes time limits for the filing of workers' compensation claim petitions. In cases of occupational disease, the Act provides that

> where a claimant knew the nature of the disability and its relation to the employment, all claims for compensation for compensable occupational disease ... shall be barred unless a petition is filed ... within 2 years after the date on which the claimant first knew the nature of the disability and its relation to the employment.
>
> [*N.J.S.A.* 34:15–34.]

The Act further provides that if "a part of the compensation has been paid by [the] employer," the claim is barred unless filed "within 2 years after the last payment of compensation." *Ibid.*

From 1983 through the commencement of this litigation, Sheffield received private-plan disability benefits and private-plan medical benefits from Schering Plough's insurers. In February

1989, Sheffield filed two workers' compensation claim petitions alleging occupational injuries involving her back, lungs, stomach, internal organs, and nervous system. The Division of Workers' Compensation (the Division) found that Sheffield's back injuries were causally related to her employment at Schering Plough and that she is disabled as a result of those injuries, but dismissed her claim for back-related disability as time-barred. The Division dismissed Sheffield's other claims as not compensable. The Appellate Division affirmed in an unpublished opinion. We granted Sheffield's petition for certification, 142 *N.J.* 454, 663 *A.*2d 1361 (1995), primarily to consider whether Sheffield's claims were filed within time.

I

Lodean Sheffield worked for Schering Plough Corporation from the early 1960s until mid–1983. She first worked as a matron, cleaning bathrooms at the company's Union, New Jersey, facility. The work required frequent bending and stooping and involved the daily use of chemicals and cleaning agents such as ammonia. After five or six years, Sheffield became employed as a machine operator and chemical inspector in one of Schering's pharmaceutical laboratories. The inspector job entailed lifting heavy cartons of chemicals off the floor, carrying the cartons a distance of three to five feet, and then placing the cartons onto a bench for inspection. After inspecting each carton, Sheffield was required to lift it off the bench and set it down on the floor again. The cartons weighed approximately seventy-five to eighty pounds each, and Sheffield would lift and inspect fifteen or twenty of the cartons each day. At trial, Sheffield described the work pace as "go, go, go, go, go. Just steady, steady, steady, steady. You don't have time to do [anything] but pick it up and keep going and keep moving." As a machine operator, Sheffield put stoppers into medicine bottles as the bottles passed through an automated machine and then placed the bottles on trays stacked from the

floor up to five feet high. That work, also, involved repeated bending and lifting.

Sheffield began experiencing back problems in 1979, when she was treated for a back sprain and displaced disc. She returned to work with restrictions on lifting, pushing, and pulling. In 1980, Sheffield reported back pain to the company nurse. She informed the nurse that she had injured her back lifting boxes on the job. The nurse referred Sheffield to a chiropractor, who treated Sheffield for a period of time. Because Sheffield's back pain was not relieved, the chiropractor referred her to an internist, who admitted her to a hospital and called in Dr. Prada, a neurosurgeon, to consult on Sheffield's case. Dr. Prada determined that Sheffield needed back surgery.

From March to June 1983, Sheffield was out of work on temporary disability leave and received disability benefits from Prudential Insurance Company, Schering's private-plan disability insurer. Sheffield returned to work in mid-June, with restrictions on lifting. She worked for approximately three weeks and then went back on temporary disability leave in early July. Dr. Prada operated on Sheffield in July, performing a laminectomy and removing an extruded disc. Sheffield began receiving short-term disability payments from Prudential in September 1983 to supplement her temporary disability benefits.

In September 1983, Emily Androtti–Consone of Schering's Benefits Department sent Sheffield a memorandum instructing her to apply for long-term disability benefits from Travelers Insurance Company, Schering's private-plan, long-term disability insurer, and also to file for Social Security benefits. Schering's policy was to provide disabled employees with short-term benefits for up to twenty-six weeks and then to provide long-term benefits, offset by Social Security benefits.

Sheffield filed for long-term benefits in accordance with company policy. In January 1984, Sheffield began receiving long-term disability coverage from Travelers. Sheffield also filed for Social Security benefits, but her claim was denied. She subsequently

consulted an attorney and filed a second claim for Social Security benefits, but that claim was denied as well.

In March 1984, Schering's Employee Relations Manager informed Sheffield by letter that she was entitled to six months of job protection and thereafter would be considered on "conditional leave." The letter also stated that Sheffield would "continue to receive disability benefits and have group insurance coverage as long as [she was] disabled."

Sheffield received regular medical treatments from Dr. Prada in 1984, 1985, 1986, and 1987. In July 1988, Dr. Prada readmitted Sheffield to the hospital for additional surgery to relieve recurrent, severe back pain and numbness and to remove scar tissue from the 1983 surgery. Following the surgery, Dr. Prada continued to treat Sheffield on a regular basis and was still treating her in 1991 at the time of trial. Sheffield filed a new application for Social Security benefits after her 1988 operation. That claim was approved and she received an award of benefits. At Travelers' request, however, Sheffield remitted a large portion of her Social Security award to the insurer to reimburse it for the long-term disability payments it had made to her.

In addition to receiving disability payments, Sheffield also received medical benefits from Schering's insurers. Throughout her course of treatment for her back condition and continuing through the time of trial, Sheffield's medical expenses were paid by Schering's health insurance carriers, first Prudential and later John Hancock. Sheffield made the required co-payments.

Schering's personnel records reveal that, on a number of occasions, Prudential delayed or denied payment of Sheffield's claims for medical benefits on the ground that the claims should have been submitted to a workers' compensation provider rather than to Prudential, a health insurance provider. In August 1983, Prudential informed Schering that it would not pay Sheffield's claim for medical expenses for orthopedic services provided by a Dr. Botwin, an orthopedic osteopath, because the claim form indicated that the "[c]harges incurred [were] due to a work-related

injury or illness." Prudential further informed Schering that the claim "should be submitted to your Workers Compensation carrier." In response, Schering's Employee Health Services Department advised Schering's Benefits Department that Dr. Botwin's medical bill was "not job related" and should be resubmitted to Prudential with a letter stating that the claim was not a workers' compensation claim and should be paid.

In late 1986, Sheffield's husband met with Androtti–Consone and her supervisor, Karen Custack, to discuss Sheffield's medical benefits, in part because Prudential by that time had denied coverage on a large number of Sheffield's claims. Prior to the meeting, Androtti–Consone had telephoned Prudential and learned that the claims were not being paid because Sheffield had indicated on the claim forms that her injuries were work-related. At the meeting, Androtti–Consone explained to Mr. Sheffield that Prudential would continue to deny the claims if Sheffield persisted in describing the injuries as work-related. Following their discussion, it was decided that Androtti–Consone would contact Prudential to advise the insurer that Sheffield's back condition was not work-related and that the medical claims should be paid. Neither Androtti–Consone nor Custack discussed with Mr. Sheffield the availability of workers' compensation benefits.

In February 1989, Sheffield filed two claim petitions against Schering Plough for workers' compensation benefits. The first petition alleged that Sheffield was afflicted with occupational disabilities involving her "chest, lungs, nose, throat, back, . . . stomach, . . . internal organs, [and] nervous system, . . . and complications arising therefrom." The petition also alleged that Sheffield's injuries were caused by "[o]ccupational exposure to chemicals[,] dust, fumes, bending, lifting, adverse environment, stress, [and] strain." The second petition alleged that a workplace accident in June 1983—caused by "[l]ifting heavy boxes from floor to conveyor"—had resulted in injury to Sheffield's back and nervous system. Both claim petitions alleged that "Petitioner has received treatment from the respondent within [two] years from

this date." Schering's workers' compensation carrier, Travelers, filed answers to the claim petitions and invoked the affirmative defense of the statute of limitations.

In October 1989, Sheffield filed an application for benefits from the Second Injury Fund, see *N.J.S.A.* 34:15–94 to –95.5, alleging that she was totally and permanently disabled "as a result of a combination of [her] pre-existing conditions [and her] last compensable conditions." The Workers' Compensation judge joined the Second Injury Fund as a party respondent.

At trial, Sheffield indicated that she had injured her back in a work-related accident in either 1980 or 1981, rather than in 1983 as originally alleged in her claim petition. She testified that she did not recall specifically when the accident occurred, but believed that it happened about two years before she stopped working, while lifting boxes at work. Respondent Travelers therefore moved to join Liberty Mutual Insurance Company as a party respondent, as Schering's workers' compensation carrier at the time that Sheffield first manifested a compensable disability. Liberty Mutual had provided workers' compensation coverage to Schering until June 1982, and Travelers provided the coverage thereafter.

Eight medical experts testified at trial. It was undisputed that Sheffield is disabled by her back condition and that that disability is due at least in part to the repeated bending and lifting she performed while employed by Schering.

In respect of Sheffield's pulmonary-disability claim, however, although all the experts agreed that Sheffield's latest lung function tests were consistent with partial pulmonary disability, they did not agree that Sheffield's severe bronchitis was causally related to her employment at Schering. Sheffield testified that the air in the laboratory where she had worked had been stuffy from the chemical fumes, dust, and lack of windows. She further testified that the dust and fumes had made her cough and caused her to be short of breath and that she continues to have breathing difficulties and coughing episodes. Sheffield's testimony was corroborat-

ed by Schering's personnel records, which documented a history of recurrent bronchitis and upper respiratory infections beginning in 1973 and continuing throughout much of Sheffield's employment.

Sheffield's expert, Dr. Friedman, testified that, in his medical opinion, Sheffield suffers from severe, chronic occupational bronchitis attributable to her exposure to chemicals, fumes, dust, and dirt while working at the Schering plant. Schering's expert, Dr. Lewis, disagreed with that characterization of Sheffield's condition. He testified that Sheffield suffers from severe, chronic asthmatic bronchitis unrelated to employment. Dr. Lewis based his opinion on the fact that his examination of Sheffield in 1990 did not reveal any pulmonary disease or disability, while his examination of Sheffield in 1992 revealed severe asthma. He also testified that he had reviewed the records of Sheffield's September 1991 hospitalization for shortness of breath, which indicated that "[t]here was no previous history of asthma." Dr. Lewis concluded that the onset of Sheffield's pulmonary disability occurred after 1990 and that the disability had "no conceivable relationship" to Sheffield's prior employment at Schering.

The Division of Workers' Compensation issued an oral opinion dismissing all of Sheffield's claims. In respect of Sheffield's back-injury claim, the Division determined that although there was insufficient evidence of a specific work-related accident, sufficient evidence demonstrated that "if [Sheffield's] back [condition] was not caused by her work, it could very well have been accelerated, exacerbated or aggravated by her working conditions." The Division concluded that Sheffield has a "serious orthopedic and neurological disability arising out of her employment with Schering Plough."

Nevertheless, the Division determined that Sheffield's back-injury claim was barred because Sheffield had failed to file for workers' compensation benefits within two years after she first "knew or should have known that she had an accident that occurred out of employment." The Division further concluded that Sheffield was "made aware [of] the distinction [between]

Workers' Compensation Benefits and long-term disability benefits," and that "[t]his [was] not a situation where the company was paying long-term disability and medical benefits, and therefore lulling the petitioner into a false sense of security that she was receiving Workers' Compensation Benefits."

In respect of Sheffield's claim of pulmonary disability, the Division determined that Sheffield's condition was not causally related to her employment with Schering Plough. The Division noted that there was no evidence of significant pulmonary problems in Sheffield's medical records from 1983 through 1990 and that Sheffield's severe pulmonary disability arose after 1990. The Division also dismissed Sheffield's claims for gastrointestinal disease and hypertension, finding that, concerning the former, Sheffield had failed to prove disability, and concerning the latter, Sheffield had failed to prove causation.

Because all of Sheffield's claims for workers' compensation benefits had been dismissed, the Division also dismissed Sheffield's claim for Second Injury Fund benefits.

The Appellate Division affirmed in an unpublished opinion, substantially for the reasons expressed by the Division of Workers' Compensation. The Appellate Division was satisfied that the findings and conclusions of the Workers' Compensation judge were supported by sufficient credible evidence in the record.

## II

The Workers' Compensation Act provides that, in the case of occupational disease claims,

> there shall be no time limitation upon the filing of claims for compensation ...; provided, however, that *where a claimant knew the nature of the disability and its relation to the employment, all claims for compensation for compensable occupational disease except as herein provided shall be barred unless a petition is filed in duplicate ... within 2 years after the date on which the claimant first knew the nature of the disability and its relation to the employment;* provided further, that in case an agreement of compensation for compensable occupational disease has been made between such employer and such claimant, then an employee's claim for compensation shall be barred unless a petition for compensation is duly filed ... within 2 years after the failure of the employer to make payment pursuant to the

terms of such agreement; *or in case a part of the compensation has been paid by such employer, then within 2 years after the last payment of compensation....*

*A payment or agreement to pay by the insurance carrier shall, for the purpose of this section, be deemed a payment or agreement by the employer.*

[*N.J.S.A.* 34:15–34 (emphases added).]

■ The Act establishes a similar time bar for claims that seek compensation following a work-related accident:

*Every claimant for compensation ... shall ... file a petition ... within 2 years after the date on which the accident occurred,* or in case an agreement for compensation has been made between the employer and the claimant, then within 2 years after the failure of the employer to make payment pursuant to the terms of such agreement; *or in case a part of the compensation has been paid by the employer, then within 2 years after the last payment of compensation.... A payment, or agreement to pay by the insurance carrier, shall for the purpose of this section be deemed payment or agreement by the employer.*

[*N.J.S.A.* 34:15–51 (emphases added).]

"It is manifest that a cogent object of the provision [that permits the filing of a claim within two years after the last payment of compensation] is to prevent employers and their insurers from lulling the injured employee into a false assumption of security and consequential inaction and tardiness by means of voluntary assistance."

[*De Asio v. City of Bayonne,* 62 *N.J.Super.* 232, 236, 162 *A.*2d 596 (App.Div.) (quoting *Riccioni v. American Cyanamid Co.,* 26 *N.J.Super.* 1, 6, 96 *A.*2d 765 (App.Div.), *certif. denied,* 13 *N.J.* 289, 99 *A.*2d 450 (1953)), *certif. denied,* 33 *N.J.* 386, 164 *A.*2d 849 (1960); *accord Schwarz v. Federal Shipbuilding & Dry Dock Co.,* 16 *N.J.* 243, 248, 250, 108 *A.*2d 417 (1954); *Witty v. Fortunoff,* 286 *N.J.Super.* 280, 284, 669 *A.*2d 244 (App.Div.1996).]

"The employee may well believe that he need not consult an attorney or take any legal action so long as the employer is voluntarily attempting to heal the injuries or otherwise voluntarily paying compensation." *Mangieri v. Spring Tool Co.,* 68 *N.J.Super.* 211, 220, 172 *A.*2d 56 (Law Div.1961).

Thus, "on the theory that the furnishing of any kind of benefit required by compensation law indicates an acceptance of liability and thus satisfies the policy of the 'last payment' clause," the furnishing of medical benefits is generally held to extend the time for filing a claim. 2B Arthur Larson, *The Law of Workmen's Compensation* § 78.43(h), at 15–272.33 to .45 (1988) (citing cases). Any other result would open the door "to unscrupulous employers to lull injured employees into a sense of security until their

remedy under the Workmen's Compensation Act has been lost to them by passage of time." *Fischbein v. Real Estate Management*, 131 *N.J.L.* 495, 498, 37 *A.*2d 199 (Sup.Ct.1944), *aff'd o.b.*, 132 *N.J.L.* 418, 40 *A.*2d 649 (E. & A.1945).

■ We have often noted the well-established principle that "the furnishing of medical treatment is in the nature of compensation and constitutes a part 'payment' thereof." *Sa v. H.L. Harrison & Son, Inc.*, 38 *N.J.* 203, 207, 183 *A.*2d 410 (1962); *see Pfahler v. Eclipse Pioneer Div. of Bendix Aviation Corp.*, 21 *N.J.* 486, 488, 122 *A.*2d 644 (1956); *Schwarz, supra*, 16 *N.J.* at 248, 108 *A.*2d 417; *Sampson v. Thornton*, 8 *N.J.* 415, 419–20, 86 *A.*2d 117 (1952); *Oldfield v. New Jersey Realty Co.*, 1 *N.J.* 63, 67, 61 *A.*2d 767 (1948); *accord Milos v. Exxon Co., USA*, 281 *N.J.Super.* 194, 198–99, 656 *A.*2d 1300 (App.Div.1995), *aff'd o.b.*, 143 *N.J.* 333, 671 *A.*2d 120 (1996); *Riccioni, supra*, 26 *N.J.Super.* at 4–5, 96 *A.*2d 765. Thus, "[w]here medical treatment which could have been required under the [workers' compensation] statute is actually furnished by the employer, such treatment is considered 'payment of compensation' and a claim petition filed within two years of such 'payment' is within time." *Schwarz, supra*, 16 *N.J.* at 248, 108 *A.*2d 417; *accord Milos, supra*, 281 *N.J.Super.* at 199, 656 *A.*2d 1300. Just this term, we affirmed the Appellate Division's holding in *Milos v. Exxon Co., USA*, 281 *N.J.Super.* 194, 199, 656 *A.*2d 1300, that "treatment need not be given pursuant to an award [of workers' compensation benefits] in order to qualify as a 'payment [of compensation]'; the test is whether the treatment is required under the Act." *See* 143 *N.J.* 333, 671 *A.*2d 120 (1996); *see also Fischbein, supra*, 131 *N.J.L.* at 498, 37 *A.*2d 199 (" 'There seems no reason if a payment be made, which could have been required under the [A]ct, to limit the period in which a petition may be filed by a judicial construction which defeats the interests of the [worker].' " (quoting *Betsy Ross Ice Cream Co. v. Greif*, 127 *N.J.L.* 323, 325, 22 *A.*2d 571 (Sup.Ct.1941))).

■ We look to the Act itself to ascertain the extent of the employer's obligation to furnish medical treatment to employees injured in the line of work. The Act provides in relevant part:

> The employer shall furnish to the injured worker such medical, surgical and other treatment, and hospital service as shall be necessary to cure and relieve the worker of the effects of the injury and to restore the functions of the injured member or organ where such restoration is possible....
>
> [*N.J.S.A.* 34:15–15.]

We note that medical treatment need not be furnished directly by the employer to constitute compensation under the Act. "A payment or agreement to pay by the [employer's] insurance carrier shall ... be deemed a payment or agreement by the employer." *N.J.S.A.* 34:15–34. Where the employer has expressly authorized or arranged for the provision of medical treatment or the payment of compensation therefor, the effect is the same as if the employer itself had furnished the treatment or compensation. *See Mangieri, supra,* 68 *N.J.Super.* at 217–18, 172 *A.*2d 56; *Dunay v. International Smelting & Refining Co.,* 60 *N.J.Super.* 546, 551, 160 *A.*2d 80 (Law Div.1960); *see also Lynch v. City of Newark,* 43 *N.J.Super.* 546, 550–51, 129 *A.*2d 324 (Law Div.) (holding that silence of city-employer over seven-year period following work-related accident during which firefighter-employee received continuous medical treatments supervised by city's fire surgeon but paid for by private, independent Firemen's Relief Association constituted implied authorization for employee to seek all treatment that city was required to furnish by law and therefore rendered employee's claim timely), *aff'd,* 46 *N.J.Super.* 335, 134 *A.*2d 716 (App.Div.1957); *Reilly v. City of Newark,* 30 *N.J.Super.* 72, 76, 103 *A.*2d 396 (Law Div.1954) ("[T]he city having accepted the benefits of payment of [medical] bills properly chargeable to [it] for services rendered to firemen injured in compensable accidents by the Firemen's Relief Association, is estopped from denying that treatments rendered ... or that bills ... paid ... are the act of the city.").

Thus, in *Dunay, supra,* the court held that the payment of disability and medical benefits by an employee benefit association constituted the payment of compensation by the employer. 60 *N.J.Super.* at 551, 160 *A.*2d 80. The employee in *Dunay,* a railroad brakeman, was injured in 1950 when he "felt a snap in his back" while bending down to throw a switch on the railroad track.

*Id.* at 549, 160 *A.*2d 80. The plant doctor treated Dunay at home the next day, and treatments continued for a number of weeks. After Dunay returned to work, subsequent treatments were prescribed, and in 1955 and 1956 Dunay underwent back surgery. Medical treatment continued until 1957. Throughout the period of Dunay's disability, he received temporary disability benefits from an employee benefit association that was administered by the employer's personnel department. In addition, Dunay's medical bills were paid in part by the benefit association and in part by Blue Cross and Blue Shield. The same doctors treated the employees whether the payments ultimately were made by the benefit association or workers' compensation insurance. Dunay filed a petition for workers' compensation benefits within two years of receiving medical treatment paid for by the benefit association. *Id.* at 549–51, 160 *A.*2d 80. The court concluded that

the medical and surgical services and payments received by the petitioner through the employee benefit association must be considered "a part of the compensation * * * paid by the employer." Since the last treatment provided for the petitioner admittedly was within a two-year period before the institution of the workmen's compensation proceeding, the present action is timely.

  *   *   *   *   *   *   *   *

In the instant case respondent has organized an employee benefit association which appears to the workman as a company project and not as an independent entity. Petitioner testified that the *company* paid the benefits.... [B]oth the workmen's compensation and employee benefit programs were administered by the same person in the same office of the personnel department of respondent. The same doctors provided treatment whether the case came under the employee benefit or workmen's compensation program. This arrangement certainly has the effect of lulling the employee into a false assumption of security.

The obligation to furnish medical treatment for a compensable accident under the Workmen's Compensation Act is placed upon the employer.... The employer, having accepted the benefits of payment of bills by the employee benefit association properly chargeable to [it] for services to an employee injured in a compensable accident, may not deny that treatments rendered by plant physicians were the act of the [employer]....

.... Petitioner may not be barred from the benefits of the workmen's compensation laws by the acts of his employer in creating a situation designed to provide a false sense of security to an injured employee. Workmen, often uneducated and foreign-speaking, cannot be required to differentiate between employee benefit and workmen's compensation programs administered by the same plant officials and the same plant doctors.

[*Id.* at 551–52, 160 *A.*2d 80 (quoting *R.S.* (*N.J.S.A.*) 34:15–51) (citations omitted).]

■ Conversely, where the employee obtains medical treatment in the absence of any authorization by the employer, the treatment generally will not constitute payment of compensation extending the limitations period. *Mangieri, supra,* 68 *N.J.Super.* at 218, 172 *A.*2d 56; *De Asio, supra,* 62 *N.J.Super.* at 238–40, 162 *A.*2d 596. Thus, in *De Asio* the Appellate Division held that there was no "payment of compensation" extending the statutory limitations period where the employer had furnished no medical treatment, the employee had never requested the employer to furnish medical treatment, the employee was treated by his own physicians, and the employee paid the premiums on his own health insurance policies. 62 *N.J.Super.* at 240, 162 *A.*2d 596.

### III

■ The Division of Workers' Compensation determined that, more than two years prior to the filing of her claim petitions for workers' compensation benefits, Sheffield knew or should have known the nature of her back injury and its relation to her employment. The Division therefore ruled that Sheffield's claim petitions were filed out-of-time, and the Appellate Division affirmed. We are satisfied that there is sufficient credible evidence in the record to support that determination, although we note that the statutory language contemplates *actual* knowledge of the nature of the disability and its relation to the employment. See *N.J.S.A.* 34:15–34 (providing that two-year limitations period begins to run when "claimant first knew the nature of the disability and its relation to the employment"); *Panzino v. Continental Can Co.,* 71 *N.J.* 298, 302–03, 364 *A.*2d 1043 (1976) (discussing legislative history of *N.J.S.A.* 34:15–34). We conclude, however, that Sheffield's awareness of the nature of her injury and its relationship to her employment is not dispositive of this appeal, because we find that the statutory limitations period was tolled by the "payment of compensation" to Sheffield. See *N.J.S.A.* 34:15–34.

We hold that the private-plan disability and medical benefits provided to Sheffield pursuant to Schering's scheme of compensation for disabled employees constituted payments of compensation within the meaning of *N.J.S.A.* 34:15–34. *See* 2B Larson, *supra*, § 78.43(c), at 15–272.17 ("When payment of either income or medical benefits has been made by a private employer-employee benefit association or insurance plan, this has usually ... been held to toll the statute."); *see also Dunay, supra,* 60 *N.J.Super.* at 551, 160 *A.*2d 80 (holding that injured employee's receipt of medical payments and weekly benefits from employee benefit association constituted compensation by employer tolling the statutory period). The record reveals that Schering's private-plan insurers were providing medical and disability benefits to Sheffield up to the time of trial. There can be no question that the medical benefits Sheffield received were in the nature of payments of compensation for medical treatments that could have been required under the Act as "necessary to cure and relieve ... the effects of the injury" to her back. *N.J.S.A.* 34:15–15; *see Milos, supra,* 281 *N.J.Super.* at 199, 656 *A.*2d 1300. With respect to the disability payments, the majority rule would appear to be that such payments also toll the statutory period if the employer is aware of the existence of a work-related injury and the employee reasonably would have understood that the payments constituted, wholly or in part, compensation for an injury compensable under the Act. *See* 2B Larson, *supra*, § 78.43(1), at 15–279 to –294; *Savina v. Litton Indus./Litton Medical Sys.,* 330 *N.W.*2d 456, 457–58 (Minn.1983) (holding that employer's action in arranging for payment through its group-insurance plan of wage and disability benefits to injured employee who had notified employer of work-related injury tolled limitations period of workers' compensation act); *Frost v. Anaconda Co.,* 198 *Mont.* 216, 645 *P.*2d 419, 422–23 (1982) (holding that benefits paid to injured employee pursuant to employer's benefit program for salaried employees unable to work due to disability, whether work-related or not, tolled limitations period of workers' compensation act where employer was on notice that injury was work-related and benefits

paid to employee were substantially comparable to workers' compensation benefits); *Lusk v. Consolidated Aluminum Corp.*, 655 *S.W.*2d 917, 920–21 (Tenn.1983) (holding that payments made pursuant to employer's "accident and sickness" group-insurance policy tolled limitations period of workers' compensation act where injured employee reasonably believed that such payments, which were designated as "disability" and "lost time" payments on check stubs, constituted workers' compensation benefits); *see also N.J.S.A.* 34:15–12 (providing for payment of disability compensation to injured workers). Consequently, because Sheffield filed her claim petitions within two years of receiving payments constituting payments of compensation under the Act, the Division erred in dismissing her petitions as time-barred.

Contrary to the view expressed by our dissenting colleague, see *post* at 467, 680 *A.*2d at 763–64, it is widely accepted that a payment made to compensate for medical expenses incurred as a result of a work-related injury constitutes a payment of compensation that tolls the statutory period if the payment could have been required under the workers' compensation statute, regardless of whether that payment was made by a workers' compensation carrier, directly by the employer, or through the employer's private-plan health or accident insurer. *See* 2B Larson, *supra*, § 78.43(c), at 15–272.17 to .25 (discussing cases involving "[p]ayment of benefits by private employer or union sickness and accident insurance or pension plan"); *cf. Milos, supra*, 281 *N.J.Super.* at 199, 656 *A.*2d 1300 ("[Medical] treatment need not be given pursuant to an award [of workers' compensation] in order to qualify as a "payment"; the test is whether the treatment is required under the Act."). See also discussion, *supra*, at 454–57, 680 *A.*2d at 756–58.

▮ Thus, the precise source of the payment is irrelevant. What is critical is that the payment to the injured employee could have been compelled under the Act to compensate that employee for the work-related injury. *See Milos, supra*, 281 *N.J.Super.* at 200, 656 *A.*2d 1300 ("[T]he [medical] treatment need not have been

actually awarded [under the Act], it need only be statutorily required. It is irrelevant that other employees, who [are] not suffering from [work-related injury], also receive[ ] [like treatment]. Because such persons are not 'injured workers,' the [treatments], as applied to them, are not treatment[s] required by statute. In those specific instances the [medical treatments] are a voluntary benefit."). We also acknowledge that health-insurance carriers and workers' compensation carriers generally assume the cost of different health-related obligations of their insureds. However, because of Schering's direct involvement in inducing its health-insurance carrier to pay for medical expenses incurred by Sheffield for her work-related injuries, the fact that those payments were made by a health-insurance carrier rather than a workers' compensation carrier obviously is irrelevant. The decisive facts are that the payments were for a work-related injury and could have been compelled under the Act.

■■■■■ We need not determine whether or to what extent employers assume an affirmative obligation to inform their employees of the availability of workers' compensation benefits. In our view, however, when an employer undertakes to advise an injured employee to apply for certain disability or medical benefits that are authorized by the employer, the employer necessarily assumes a further obligation not to divert the employee from the remedies available under the Act. The advice to Sheffield by Schering's Benefits Department that she disclaim the work-related nature of her back injury when submitting claims for medical benefits arguably could support the conclusion that the company would be precluded from asserting the statutory bar by reason of its conduct, a question we need not reach and do not decide. We have previously observed that because the Act is remedial in nature, "care should be taken by the courts to guard against the employer lulling an employee into the belief he would be compensated either by the payment of compensation or the furnishing of medical attention or both." *Schwarz, supra,* 16 *N.J.* at 250, 108 *A.*2d 417. The result we reach today is consistent with the

purposes of the Act: "to shoulder on industry the expense incident to the hazards of industry; to lift from the public the burden to support those incapacitated by industry and to ultimately pass on to the consumers of the products of industry such expense." *Morris v. Hermann Forwarding Co.*, 18 *N.J.* 195, 197–98, 113 *A.*2d 513 (1955) (internal quotations omitted); *accord Milos, supra*, 281 *N.J.Super.* at 200, 656 *A.*2d 1300 (quoting *Morris, supra*).

We also address Sheffield's contention that the Division erred in dismissing her pulmonary-disability claim on the ground that that disability was not causally related to her employment. Our limited scope of review on appeal is

"whether the findings made could reasonably have been reached on sufficient credible evidence present in the record," considering "the proofs as a whole," with due regard to the opportunity of the one who heard the witnesses to judge their credibility and[,] in the case of agency review, with due regard also to the agency's expertise where such expertise is a pertinent factor.

[*Close v. Kordulak Bros.*, 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965) (citation omitted) (quoting *State v. Johnson*, 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964)); *accord Bradley v. Henry Townsend Moving & Storage Co.*, 78 *N.J.* 532, 534, 397 *A.*2d 323 (1979).]

Our review of the record persuades us that the Division's determination in respect of Sheffield's pulmonary-disability claim was based on sufficient credible evidence and must be upheld. *See Paul v. Baltimore Upholstering Co.*, 66 *N.J.* 111, 121, 328 *A.*2d 610 (1974) (noting that it is within compensation judge's province to accept or reject opinions of expert physicians concerning causation).

IV

Sheffield also contends that the Division should have required respondents to furnish her with the trial transcript that she was obligated to provide on appeal. That contention is without merit. See *R.* 2:6–12(a) (requiring appellant to furnish copy of trial transcript to respondent).

## V

Respondent Liberty Mutual contends that as a prior insurance carrier it is not liable on Sheffield's claims of occupational disability, regardless of the disposition of this appeal. Respondent Second Injury Fund asserts that it, too, is not liable on the claims. Neither the Division of Workers' Compensation nor the Appellate Division addressed either of those contentions, and respondents did not file cross-petitions for certification in response to Sheffield's petition for certification. Therefore, respondents' contentions are not properly before the Court. *R.* 2:2–1(a)(2), (b).

## VI

The judgment of the Appellate Division is reversed in part and affirmed in part. We remand to the Division of Workers' Compensation for the imposition of an appropriate award of workers' compensation benefits.

POLLOCK, J., dissenting.

The Division of Workers' Compensation (the Division) dismissed the petition of petitioner, Lodean Sheffield, because she had failed to file for workers' compensation benefits within two years after she first "knew of the disability and its relation to the employment." *N.J.S.A.* 34:15–34. In affirming the dismissal, the Appellate Division succinctly summarized the findings of the Division.

The Division judge held that petitioner sustained orthopedic and neurological disabilities arising out of her employment with Schering, but that her claims for such injuries and disabilities were barred by the two-year statute of limitations. *N.J.S.A.* 34:15–41; *N.J.S.A.* 34:15–51 and *N.J.S.A.* 34:15–34. The judge found that petitioner had "sufficient awareness to have known or should have known that she had a compensable condition that may have arisen out of her employment" in 1983 and that since the claim petitions were not filed until February 1989, more than two years thereafter, they were time-barred. The judge further held that petitioner's alleged gastrointestinal problems were not compensable because no real disability existed and that even if there were a gastrointestinal disability, it would not be compensable because it flowed from petitioner's back injury, which was barred by the two-year statute of limitations. Finally, the judge held that petitioner's hypertension was not related to her employment with Schering and that she failed to sustain her burden of proving that her pulmonary and internal

conditions and disabilities were causally related to her employment. The judge, therefore, dismissed petitioner's claim petitions against Schering and its workers' compensation carriers, respondents Travelers Insurance Company (Travelers) and Liberty Mutual Insurance Company, and her petition for Second Injury Fund Benefits.

After carefully considering the record, the Appellate Division concluded that the judge's findings were supported by substantial credible evidence in the record. *Bradley v. Henry Townsend Moving & Storage Co.*, 78 *N.J.* 532, 534, 397 *A.*2d 323 (1979). I agree.

Because of the importance of the judge's findings, I include the part that pertains to the timeliness of the filing of petitioner's claim:

A very serious issue involved is the affirmative defense of Statute of Limitations. Petitioner has two years under the Workers' Compensation Statute to file from when she knew or should have known she had a compensable accident related to her employment.

The files indicate that Petitioner had been treated for her lower back since 1979. The petitioner testified in around 1980 [that] she actively lifted and felt pain in her lower back. The petitioner testified that her back was aching and causing her problems when she was bending and lifting packages.

In the 1983 hospital record, the petitioner specifically stated or gave the history of her back problem caused by her work at Schering Plough. Petitioner also complained to Prudential Insurance Company, the company's private plan, that her back condition was caused by her work. As a result of that, Prudential sent her a letter indicating that they were not going to pay any further benefits, and she would have to look to Workers' Compensation. Mrs. Androtti, of the long-term disability department, told her that if she had intended to get benefits from Prudential, she should not push the idea to Prudential that she was hurt at work.

Now, all this showed a definite distinction between Workers' Compensation and other benefits. This is not a situation where the company was paying long-term disability and medical benefits, and therefore lulling the petitioner into a false sense of security that she was receiving Workers' Compensation Benefits.

Petitioner was aware she hurt herself at work. She took the position that she could not say that she hurt herself at work if she continued to receive her current benefits, she was thus made aware between the distinction of Workers' Compensation Benefits and long-term disability benefits. . . .

It is petitioner's position that she was not aware of Workers' Compensation and she was lulled in the false sense of security. Petitioner's attorney alleges that respondent took a step to advise her on her right and did not inform her of Workers' Compensation benefits.

The respondent has [a] long-term disability benefits department and the petitioner has been receiving long-term disability benefits to the present. The payment of her long-term disability benefits, which she would be entitled to under her employment contract, and by making sure she received the medical benefits she was entitled to, does not put the respondent in the position of being her legal advisor or her representative. It is clear from Ms. Androtti's testimony that she advised [petitioner] as far as long-term disability, it was not her business to advise her of Workers' Compensation.

The decision of whether [sic] petitioner is entitled to by the company of [sic] Workers' Compensation resided in the Health Benefits Department. The decision made by the Health Benefits Department was that petitioner was not entitled to Workers' Compensation. Her benefits fell under long-term disability.

Whether or not that turns out to be a correct assessment is really immaterial. They made a conscious effort to decide about Workers' Compensation, they did not mislead petitioner. I do not think that they have an affirmative duty to sit her down and talk to her about the possibilities of Workers' Compensation. They are not her lawyers and the fact that they sit her down and advise her of other benefits and private benefits she's entitled to does not make them her overall Counselors for any possible suits against the company.

Furthermore, I don't see any attempt to defraud the petitioner. The respondent, based on the information that [s]he had, could very well have come to the conclusion that there was no compensation case and there was no particular accident. Petitioner was complaining about her back at least since 1979 and had definite diagnosis of a lower back condition in 1980.

The petitioner did say, in her hospitalization in 1983, that it happened at work and they were aware that there were problems in bending and lifting. That, in and of itself, did not make clear that there was a Workers' Compensation suit. An attorney [Jacob Balk] who saw her [regarding] Social Security and had a good percent of his practice dealing with Workers' Compensation had all her medical records to send in to the Social Security Division. Apparently, based on his file, he did not see a connection of Workers' Compensation Benefits or work-related injury.

Again, whether that was a correct assessment or incorrect assessment, it certainly could have been a reasonable assessment under the circumstances.

Based on the testimony of the petitioner in 1991, the court could take the position that her back condition was aggravated, accelerated and exacerbated by her work, this was after a trial with doctors testifying in which this assessment could be made. The company's position was not, therefore, unreasonable.

Furthermore, it is really not what is in the company's mind as to knowledge and notice of a possible work-connected accident. The statute of limitations begins to run when the petitioner knew or should have known of a work-related accident occurring or a compensable condition occurring out of her employment.

Petitioner gave a history in the hospital record of 1983 that the work was related to her back problems. She was told by the company that if she persisted in stating her back problems occurred out of the work, that she would not be able to receive money from Prudential Insurance Company. There was a distinction being made there.

It is clear to me that she had a sufficient awareness to have known or should have known that she had a compensable condition that may have risen out of the employment.

As the record reveals, petitioner elected to receive payments from respondent's private-plan medical insurers, Prudential and John Hancock. Respondent's long-term disability insurer, Travelers, paid her disability benefits. Respondent's workers' compensation carriers, originally Liberty Mutual and later Travelers, made no payments. The reason is that petitioner did not seek to recover workers' compensation from respondent until after she had already received the medical and disability benefits under other policies.

On these facts, the majority holds "that the private-plan disability and medical benefits provided to Sheffield pursuant to Schering's scheme of compensation of disabled employees constituted payments of compensation within the meaning of *N.J.S.A.* 34:15–34." *Ante* at 458, 680 *A*.2d at 758. To reach that result, the majority ignores the finding of the workers' compensation judge that Sheffield knew the difference between workers' compensation benefits and the private plan benefits. It also ignores the judge's findings that Sheffield accepted payments under the latter plans and that Schering did not mislead Sheffield regarding the availability of workers' compensation benefits.

The essential facts are that the employer subscribed to private medical and disability plans, and that the employee knew the differences between recovery under those plans and under workers' compensation. Further, the employee decided to pursue payments under the private plans, not under workers' compensation. Nonetheless, the majority states that "the precise source of the payment is irrelevant. What is critical is that the payment to the injured employee could have been compelled under the Act to compensate that employee for the work-related injury." *Ante* at 459, 680 *A*.2d at 759. In so finding, the majority has transformed payments under private health and disability plans into payments under a workers' compensation plan, with the result that the payments under the private plans toll the time of an employee to

file a workers' compensation claim, notwithstanding the employee's original decision not to seek workers' compensation.

The majority relies on *Dunay v. International Smelting and Refining Co.*, 60 *N.J.Super.* 546, 160 *A.*2d 80 (Law Div.1960), to support its broad ruling that payment of private medical benefits tolls the statute of limitations on a workers' compensation claim. *Dunay* is distinguishable on its facts. The claimant in that case did not know whether his benefits came from the employer's workers' compensation insurance carrier or a private employee benefit association, "which appeared to the workman as a company project and not as an independent entity." *Id.* at 551, 160 *A.*2d 80. The court found that "[t]his arrangement certainly has the effect of lulling the employee into a false assumption of security." *Id.* at 552, 160 *A.*2d 80. Thus, *Dunay* stands as an exception to the two-year statute of limitations, because the employer misled the employee to believe he was receiving compensation. The case hardly supports such a broad ruling as the majority contends.

By contrast, in this case, petitioner knew that she was receiving medical benefits under respondent's private plan to which she made co-payments, and not under respondent's workers' compensation plan.

To support its new rule, the majority also overreads our recent affirmance of the Appellate Division decision in *Milos v. Exxon, Co., USA,* 143 *N.J.* 333, 671 *A.*2d 120 (1996), *aff'g p.c.o.b.* 281 *N.J.Super.* 194, 656 *A.*2d 1300 (App.Div.1995). In that case, Exxon instituted the Exxon Surveillance Program pursuant to a collective bargaining agreement with the employee's union, 281 *N.J.Super.* at 197, 656 *A.*2d 1300, to counter the unique problems with diagnosing and tracking asbestos-related diseases, which often do not develop or progress until years after exposure. The employee previously had received payments under workers' compensation for disability due to asbestos exposure. *Id.* To the extent that the employee was already diagnosed with a work-related pulmonary disability and had received benefits, his annual

monitoring examinations under the program constituted continued compensation by the employer and tolled the statute of limitations on the employee's application for a reopener. *Id.* at 200, 656 *A.*2d 1300.

The majority reads *Milos* to support its contention that any private benefits paid to an employee for an injury for which the employer has not conceded responsibility nevertheless tolls the limitations period on a workers' compensation claim, even if the employee knew her injury was work-related and selected private insurance benefits. That interpretation expands the ruling in *Milos* far beyond the limits of that case. Moreover, that interpretation unnecessarily extends the statute of limitations beyond the two years contemplated by the Legislature for ordinary cases such as Sheffield's.

If respondent's workers' compensation carrier had paid petitioner medical expenses, the majority's result would be correct. "The furnishing of medical benefits is held to extend the claim period on the theory that the furnishing of any kind of benefit required by compensation law indicates to the employee an acceptance by the employer of liability for the injury." *De Asio v. Bayonne,* 62 *N.J.Super.* 232, 236, 162 *A.*2d 596 (App.Div.1960). To hold, however, that payments under a private medical or disability plan toll the time for filing a workers' compensation petition is extraordinary. *See* 2B Larson, *supra,* § 78.43(1), at 15–279. I can find no case—and the majority cites none—tolling the period of limitations for filing a compensation claim on facts similar to this case. Those facts include an employee who, knowing the difference between workers' compensation benefits and private medical and disability benefits, elected and accepted the private benefits. Those facts also include an employer who, in paying the private benefits, did not acknowledge liability in workers' compensation.

In an era when the role of employers in the delivery of health care is increasingly important, the majority opinion gives employers a disincentive to provide their employees with medical and disability benefits. Under the majority holding, an employer, by

directly or indirectly paying an employee private medical or disability benefits, tolls the running of the statute of limitations on a workers' compensation claim. The practice could discourage employers from buying health insurance to pay medical and disability benefits for employees. It also extends the employer's exposure for liability in workers' compensation beyond the period contemplated by the Legislature. I would affirm.

*For reversal in part; for affirmance in part*—Justices HANDLER, O'HERN, STEIN and COLEMAN—4.

*For affirmance*—Justice POLLOCK—1.