712 A.2d 1202

JOAN EARL, PETITIONER–RESPONDENT, v. JOHNSON & JOHNSON, RESPONDENT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted April 22, 1998—Decided June 23, 1998.

Before Judges BAIME, BROCHIN and WEFING.

*Hill Wallack*, attorneys for appellant (*Julie C. Blitzer*, on the brief).

*Wysoker, Glassner & Weingartner*, attorneys for respondent (*Allan L. Lockspeiser*, on the brief).

The opinion of the court was delivered by

BROCHIN, J.A.D.

Petitioner Joan Earl worked as a secretary or clerk for respondent Johnson & Johnson from 1973 to 1993. From 1985 to 1993, she worked in a building referred to as Kilmer House. She spent a significant part of every day in a small file room. The windows of the file room were nailed shut. The file drawers were lined with gypsum sheet rock which crumbled into a powder when it was rubbed. The powder got onto her hands, her clothing, and sometimes her face, and she inhaled the powder that was in the air within the file room. Outside of the file room, she worked in a small office with seven other employees. The ventilating system was inadequate, and the air was contaminated by stale cigarette smoke, employees' perfume, and exhaust fumes from a helicopter that were sucked into the building when it stopped at Kilmer House once or twice a week.

From 1985 through 1988, Ms. Earl developed difficulties in breathing, sore throats, bronchitis, and respiratory and sinus infections. These conditions were most severe while petitioner was at work. During the winter of 1989, she became seriously ill while she was at work. She could not catch her breath. When

she went outside for fresh air, she was physically unable to walk to her car. A security guard called her son and he drove her to her family doctor. She was given an injection of adrenaline and some other medication. Several months later, she again experienced a sudden onset of difficulty breathing, and she was examined and treated by Dr. Nicholas Melillo, a pulmonary specialist, to whom she was referred by her family physician.

Ms. Earl was hospitalized under Dr. Melillo's care for her pulmonary conditions in 1989 and 1993. In 1989, Dr. Melillo diagnosed her as suffering from asthma and chronic obstructive lung disease, a term which, according to her expert medical witness, Dr. Malcolm Hermele, encompasses emphysema. Dr. Melillo continued to treat Ms. Earl for those conditions through the time of the trial. Neither her family doctor nor Dr. Melillo testified.

Dr. Hermele examined Ms. Earl in 1994 and 1996. He testified that she was suffering from chronic obstructive pulmonary disease, asthma, and emphysema. He expressed the opinion that in 1994, she had a permanent partial disability of sixty percent. He estimated that by 1996, as the result of her chronic obstructive pulmonary disease and asthma, her disability was seventy percent. Dr. Hermele expressed the opinion that petitioner's pulmonary condition was the result of her exposure to lung irritants at work, particularly the gypsum.

Dr. Ilia Segal was Johnson & Johnson's medical expert. He diagnosed Ms. Earl's condition as bronchial asthma or allergic asthmatic bronchitis. He estimated her permanent pulmonary disability at five percent. He did not attribute the condition to her work environment.

The workers' compensation judge found that Ms. Earl was suffering from chronic obstructive pulmonary disease and asthma. He determined that her exposure to lung irritants at work, particularly the gypsum, was a substantial cause of her medical condition. He awarded her a forty percent permanent partial

disability for the residuals of chronic asthmatic bronchitis and chronic pulmonary disease.

On appeal, Johnson & Johnson argues that there is insufficient proof in the record to support the judge's findings. Johnson & Johnson also argues that Ms. Earl's petition should have been dismissed because it was not filed within two years after she "first knew the nature of the disability and its relation to the employment," as required by *N.J.S.A.* 34:15–34.

■ There is substantial credible evidence in the record to sustain the workers' compensation judge's findings that petitioner suffers from a forty percent disability as the result of bronchitis and pulmonary disease which arose out of and during the course of her employment. We therefore reject the employer's argument to the contrary. *Close v. Kordulak Bros.*, 44 *N.J.* 589, 598–99, 210 *A.*2d 753 (1965).

Ms. Earl filed her petition on September 10, 1993. Johnson & Johnson claims she knew the nature of her disability and its relation to her employment in 1989. *N.J.S.A.* 34:15–34, on which Johnson & Johnson's argument for dismissal is based, reads in part as follows:

> [T]here shall be no time limitation upon the filing of claims for compensation for compensable occupational disease ...; provided, however, that where a claimant knew the nature of the disability and its relation to the employment, all claims for compensation for compensable occupational disease except as herein provided shall be barred unless a petition is filed ... within 2 years after the date on which the claimant first knew the nature of the disability and its relation to the employment .... provided further, ... an employee's claim for compensation shall be barred unless a petition for compensation is duly filed ... within 2 years after the last payment of compensation....
>
> A payment ... by the insurance carrier shall ... be deemed a payment ... by the employer.

The judge of workers' compensation held that Ms. Earl's filing of her petition was not untimely. He ruled that the period of limitations did not begin to run in 1989 because Ms. Earl did not know the nature of her disability until she knew its extent as indicated by the results of pulmonary function tests which were administered to her in 1994 and 1996, after she had filed her

petition. He also ruled that, if the period of limitations did begin to run, it was tolled because a health insurance plan provided by Johnson & Johnson paid for most of the cost of Ms. Earl's medical care. Her brief to our court supports these arguments and, in addition, argues that she cannot be deemed to have known the nature of her disability and its relation to her employment more than two years before she filed her petition because during the trial itself Johnson & Johnson's medical expert disputed the nature of her disability and its causal relation to her employment.

Ms. Earl was admitted to the hospital in 1989 with "acute bronchitis with chronic obstructive lung disease." On direct examination, she testified that after her hospitalization in 1989, Dr. Melillo treated her for asthma and "something to do with respiratory," and that these are the same conditions for which he was continuing to treat her at the time of the trial. On cross-examination, she testified that she was "actually diagnosed as having asthma" in the early part of March 1989. The records of her 1989 hospitalization show that Ms. Earl was suffering from "asthma and having difficulty breathing."

The report of Dr. Malcolm Hermele was read into the record. In the report, Dr. Hermele stated that "Dr. Melillo saw her in May of 1989 and diagnosed asthma and chronic obstructive lung disease" and "indicated that she should not be in an environment which exposed her to irritants." According to Dr. Hermele's report, Dr. Melillo's May 15, 1989 report states that Ms. Earl has "asthma and COPD," *i.e.*, chronic occupational pulmonary disease. Dr. Hermele was asked whether "asthma and emphysema," his diagnosis of Ms. Earl's ailments in 1996, "correspond[ ] to Dr. Melillo's diagnosis of asthma and COPD." He answered that the two diagnoses do correspond, that "asthma is a hyper-reactivity of the airways to certain ... substances and COPD ... [is] used interchangeably with emphysema and it essentially decreases lung tissue and exchanges oxygen and carbon dioxide." Later in his testimony, Dr. Hermele reiterated that his 1996 diagnosis of chronic bronchitis, emphysema, and asthma "were essentially the

same diagnoses that [Dr. Hermele] had in 1994 and that Dr. Melillo was finding."

As we have already mentioned, the judge of workers' compensation ruled that Ms. Earl did not know the nature of her disability and its relation to her employment until she received the result of pulmonary function tests in 1994. That view appears to be based on *Mikitka v. Johns–Manville Products Corp.*, 139 *N.J.Super.* 66, 352 *A.2d* 591 (App.Div.1976). The petitioner in *Mikitka, supra,* filed a workers' compensation claim petition in March 1973 seeking an increase in her disability for the same condition for which she had previously recovered a compensation award in 1967. *Id.* at 68–69, 352 *A.2d* 591. The petition asserted that in February 1973, petitioner's doctor had found a marked increase in her disability as a result of her continued exposure to dust and fumes at her workplace between the date of her original award and her retirement in October 1970. *Id.* at 69, 352 *A.2d* 591. When the petitioner filed her 1973 claim, the relevant provision of the limitations statute required her to file it " 'within one year after [she] knew or ought to have known the nature of [her] disability and its relation to [her] employment.' " *Id.* at 70, 352 *A.2d* 591 (quoting an earlier version of *N.J.S.A.* 34:15–34). Because of the particular procedural history of her case, the petitioner's claim was compensable only if and to the extent her disability had worsened since the entry of her original award and only if she knew or ought to have known the nature of her disability within one year of filing her claim for increased disability. *Id.* at 72, 352 *A.2d* 591. Under those circumstances, this court held that she did not know the nature of her disability until she knew that she had sustained an increase in her disability since the original award. *Ibid.* It was in that context that we said, "We therefore conclude that in the unique circumstances of this case, the term 'nature of his disability' encompasses not only the type of disability but the extent thereof." *Ibid.* In the present case, Ms. Earl does not seek to recover for the increase in her disability during the two years before she filed her 1973 claim. The compensability of her disability dates from its manifestation and not from its worsening.

Ms. Earl testified that Dr. Melillo informed her in 1989 that she was suffering from asthma and "respiratory" difficulties. The 1989 hospital records show that she was admitted for asthma and chronic occupational pulmonary disease. These conditions appear to have become more debilitating since then, but the ailments diagnosed in 1994 and 1996 and for which petitioner received an award are the same ailments that she was told in 1989 were the reason for her hospitalization. Petitioner was always of the view that her difficulties were caused or substantially aggravated by environmental factors at work. She had all of the information she needed to file a workers' compensation claim in 1989. Her percentage of disability would have been less, but she would have been entitled to reopen any award as her disability became greater. See N.J.S.A. 34:15–27. We conclude, therefore, that the record in this case can lead only to the conclusion that, unless the period of limitations was tolled, it expired two years after her hospitalization in April 1989 or, in any event, more than two years before her petition was filed on September 10, 1993.

That conclusion brings us to the question whether, as the judge of compensation held, the running of the period of limitations was tolled by health insurance payments made to Ms. Earl or to her health care providers. Insofar as we can tell from the record, the doctors who treated her were her family physician and a pulmonary specialist to whom he sent her. The only evidence about the source of payment for her medical care is her testimony that she was "with the [Johnson & Johnson] hospitals plan" which paid eighty percent of the cost of her prescriptions and of her doctors' bills, but that the plan did not cover the cost of her CAT scan. No evidence was presented to show whether the entire cost of the "hospital plan" was paid by Johnson & Johnson, or whether all or part was paid by Ms. Earl. Nor was there any evidence that Johnson & Johnson paid her medical expenses under circumstances which could reasonably have given her the impression that it was paying her health care providers in partial satisfaction of its

obligations under the workers compensation laws, and Ms. Earl did not testify that she was under any such impression.

*Sheffield v. Schering Plough Corp.*, 146 *N.J.* 442, 680 *A.*2d 750 (1996), discusses at great length the circumstances under which an employer's providing or paying for medical services will toll the running of the period of limitations established by *N.J.S.A.* 34:15–34. The petitioner in *Sheffield, supra,* had worked for Schering Plough Corp. for about twenty years in positions which required repeated bending and lifting. *Id.* at 446–47, 680 *A.*2d 750. She ceased work in 1983 because of a disabling back condition. *Id.* at 447, 680 *A.*2d 750. She did not file a claim for workers' compensation until five and a half years later. *Id.* at 449, 680 *A.*2d 750. The primary issue in the case was whether her claim was barred by the two-year limitation provision of *N.J.S.A.* 34:15–34, or whether that period of limitations was tolled by another provision of the section which states that if " 'a part of the compensation has been paid by [the] employer,' the claim is barred unless filed 'within 2 years after the last payment of compensation.' " *Id.* at 445–46, 680 *A.*2d 750.

The petitioner in *Sheffield, supra,* based her tolling claim on her receipt of "private-plan disability benefits and private-plan medical benefits from Schering Plough's insurers." *Id.* at 445, 680 *A.*2d 750. Schering Plough knew that the petitioner claimed to have injured her back as the result of her work. *Id.* at 447–49, 680 *A.*2d 750. She underwent surgery for her back and was out of work on disability leave. *Id.* at 447, 680 *A.*2d 750. She received temporary disability benefits and supplementary short-term disability payments from Prudential Insurance Company, Schering's insurance company. *Ibid.* In accordance with Schering policy, its Benefits Department instructed her to file for long-term disability benefits. *Ibid.* She did so and received long-term disability payments, apparently from Travelers Insurance Company. *Ibid.* In 1984, the petitioner received a letter from Schering informing her that she would continue to receive these disability benefits and

to have group insurance coverage as long as she was disabled. *Id.* at 448, 680 *A.2d* 750.

Throughout her course of treatment and through the time of the trial, her medical expenses, less co-payments, were paid by Schering's health insurance carriers, first Prudential and later John Hancock. *Ibid.* When Prudential declined to pay particular medical expenses because it asserted they were for job-related conditions and should be paid by a workers' compensation carrier, Schering's Employee Health Services Department told its Benefits Department that those expenses were "not job related," and that they "should be resubmitted to Prudential with a letter stating that the claim was not a workers' compensation claim," and that it should be paid. *Id.* at 448–49, 680 *A.2d* 750. When Prudential denied additional claims on the ground that they were job-related, Schering's Benefits Department told the petitioner that Prudential would continue to reject the claims if she continued to describe them as work-related, and a representative of the Benefits Department undertook to contact Prudential to advise it that the condition for which the medical expenses were incurred was not job-related. *Id.* at 449, 680 *A.2d* 750.

The *Sheffield* Court declared, " 'the furnishing of medical benefits is generally held to extend the time for filing a claim.' " *Id.* at 453–54, 680 *A.2d* 750 (quoting 2B Arthur Larson, *The Law of Workmen's Compensation* § 78.43(h), at 15–272.33 to .45 (1988)). "Any other result would open the door 'to unscrupulous employers to lull injured employees into a sense of security until their remedy under the Workmen's Compensation Act has been lost to them by the passage of time.' " *Ibid.* (citation omitted).

In its opinion, the Court cites and quotes from numerous decisions which considered whether particular payments were the equivalent of an employer's paying compensation required by the Workers' Compensation Act. *Id.* at 454–56, 680 *A.2d* 750. It points out that in many of those cases payments from insurers and similar third parties were held to constitute such compensation. *Id.* at 454, 680 *A.2d* 750. It holds expressly that "the private-plan

disability and medical benefits provided to Sheffield pursuant to Schering's scheme of compensation for disabled employees constituted payments of compensation within the meaning of *N.J.S.A.* 34:15–34." *Id.* at 458, 680 *A.*2d 750 (citations omitted).

The dissent in *Sheffield, supra,* interprets the majority opinion to mean that any payments under an employer's health insurance plan that could have been required under the Workers' Compensation Act have a tolling effect. *Id.* at 465–66, 680 *A.*2d 750 (Pollock, J., dissenting). The language of the Court's opinion is subject to that interpretation. Nonetheless, we interpret it as attributing a tolling effect only to payments, whatever their source, which are made under circumstances such that they are reasonably capable of lulling the employee into refraining from filing a petition to claim his or her rights under the Workers' Compensation laws. That certainly is the most expansive reading that can be given to the cases and other texts which are cited by the Court, and those authorities are cited in a way which indicates that the Court viewed them as consistent with its opinion.

To hold, as the judge of compensation did, that payment of medical benefits by health insurance plans, without more, tolls the limitation provisions of *N.J.S.A.* 34:15–34 would, at least for most large employers, reduce those provisions to a nullity. In our view, that was not the Supreme Court's intention. We hold, therefore, that there is no evidence in the record in this case to support the determination by the judge of compensation that payments were made for Ms. Earl's medical care under circumstances which extended the time within which she could validly file her petition.

Ms. Earl's remaining tolling argument is that she could not have known the nature of her disability and its relation to her employment because the experts who testified for Johnson & Johnson denied both its severity and that it was caused by her working environment. This argument is without merit. *R.* 2:11–3(e)(1)(E).

The judgment appealed from is therefore reversed and this matter is remanded to the Division of Workers' Compensation to enter a judgment dismissing Ms. Earl's petition.