728 A.2d 820

JOAN EARL, PETITIONER–APPELLANT, v. JOHNSON & JOHNSON, RESPONDENT–RESPONDENT.

Argued March 1, 1999—Decided May 17, 1999.

*Allan L. Lockspeiser* argued the cause for appellant (*Wysoker, Glassner, Weingartner, Gonzalez & Lockspeiser,* attorneys).

*Julie C. Blitzer* argued the cause for respondent (*Hill Wallack,* attorneys).

*Craig H. Livingston* submitted a brief on behalf of *amici curiae* New Jersey State Industrial Union Council, AFL–CIO, District 15 of the International Association of Machinists and Aerospace Workers, AFL–CIO and New Jersey Advisory Council on Safety and Health (*Ball Livingston,* attorneys).

The opinion of the Court was delivered by

O'HERN, J.

This is a workers' compensation case. There are three issues: (1) whether, in violation of the applicable statute of limitations, the worker delayed filing an occupational disease claim for more than two years after the worker knew the nature of the disability and its relation to the employment; (2) whether the worker's continuous exposure until the end of employment tolled the statute of limitations; and (3) whether the worker's receipt of medical benefits through the employer's health-care provider tolled the statute of limitations. A favorable ruling on any one of these issues would entitle the worker to recover benefits.

We find that there is a sufficient basis in the record to sustain the finding of the workers' compensation judge that the worker did not know the nature of the disability until 1993, the year a claim was filed. We will discuss only briefly the remaining issues.

I

Joan Earl was employed as a secretary by Johnson & Johnson from 1973 to 1993. Beginning in 1985, she was assigned to work at the Kilmer House, a historic building owned by Johnson & Johnson and located in New Brunswick. Earl worked in the file room at the Kilmer House approximately four hours a day, five days a week, monitoring employee access to confidential files.

The ventilation in the file room was poor. Its two windows were sealed shut. To protect the files from fire hazards, the file drawers were insulated with a white, solid substance that turned into powder when the files rubbed against it. The powder would spread over the files as well as over Earl's hands and clothes. Before Earl began working at the Kilmer House, it was thought that the powder might contain asbestos, but upon investigation, it was determined that this was not the case. Johnson & Johnson's industrial hygienist identified the powder as anhydrite gypsum, a substance that contains calcium sulfate and hydrous powder. The material safety data sheet for anhydrite gypsum indicates that it

may cause irritation to the eyes and skin upon contact. Inhalation of the powder may also irritate the upper respiratory tract.

The office area outside the file room was shared by eight employees, including Earl. The ventilation system for the building was inadequate. The air was contaminated by stale cigarette smoke, employees' perfume, and exhaust fumes that were sucked into the building when a helicopter landed nearby once or twice per week.

Earl experienced sore throats, headaches, and eye irritation. In the winter of 1988, Earl developed respiratory and sinus infections and bronchitis. Her family physician treated her problems, and she returned to work. In February 1989, however, Earl had serious breathing difficulties while at work. She was immediately driven to her physician's office, where she received an adrenaline shot. Earl returned to work two weeks later.

On April 2, 1989, Earl suffered a second breathing attack. She was admitted to John F. Kennedy Medical Center, where her doctor diagnosed her with asthma and referred her to a pulmonary specialist. The specialist diagnosed Earl with asthma and chronic obstructive pulmonary disease (COPD), treated her with medications, and has continued to see her every three months. COPD is a term that encompasses a number of lung-related problems, such as bronchitis, asthma, and emphysema, which prevent the lungs from properly exchanging carbon dioxide for oxygen. Earl was not diagnosed with emphysema at the time.

After the second breathing attack, Earl asked her supervisor at Johnson & Johnson to change her duties. As a result, Earl's time in the file room was significantly reduced, but she continued to handle the files on a daily basis until October 1, 1993, when Earl's department was relocated to a new building. Earl left shortly thereafter because Johnson & Johnson offered her early retirement. Earl testified that she could have otherwise continued to work.

On September 10, 1993, Earl filed a Claim Petition with the Division of Workers' Compensation. She alleged that continuous exposure to irritants at Johnson & Johnson had caused permanent pulmonary problems. Johnson & Johnson argued that petitioner's claim was barred by the statute of limitations because Earl became aware of her breathing condition by 1989, and at that time believed that her respiratory problems were related to her work environment.

The compensation judge ruled that petitioner's claim was not barred by the statute of limitations because Earl did not become aware of the extent of her permanent loss of respiratory function until 1993. The judge also ruled that the statute of limitations was tolled pursuant to *N.J.S.A.* 34:15–34. That section states in part:

in case an agreement of compensation for compensable occupational disease has been made between such employer and such claimant, then an employee's claim for compensation shall be barred unless a petition for compensation is duly filed with such secretary within 2 years after the failure of the employer to make payment pursuant to the terms of such agreement; or in case a part of the compensation has been paid by such employer, then within 2 years after the last payment of compensation.

The compensation judge found that under *Sheffield v. Schering Plough Corp.*, 146 *N.J.* 442, 680 *A.*2d 750 (1996), Johnson & Johnson's payment of Earl's medical expenses constituted compensation under the statute. The judge found that petitioner had suffered a forty percent permanent disability and awarded her $55,200.

The Appellate Division reversed. 313 *N.J.Super.* 301, 712 *A.*2d 1202 (1998). The court held that Earl's claim was barred by the statute of limitations because Earl was aware in 1989 that her respiratory problems were attributable to her working environment. The court also determined that the payment of medical benefits by Johnson & Johnson's health insurance plan, without more, did not toll the statute of limitations. We granted Earl's petition for certification, 156 *N.J.* 426, 719 *A.*2d 1024 (1998). Because we find an adequate basis for the compensation judge to have found that Earl was not aware of the extent of her perma-

nent loss of respiratory function until 1993, the claim was within the statute of limitations. Accordingly, we reverse.

## II

Courts generally give "substantial deference" to administrative determinations. *See R & R Marketing, L.L.C. v. Brown–Forman Corp.*, 158 *N.J.* 170, 172, 729 *A.2d* 1 (1999). In the workers' compensation context, the scope of appellate review is limited to a determination of " 'whether the findings made could reasonably have been reached on sufficient credible evidence present in the record,' considering 'the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility." *Dietrich v. Toms River Bd. of Educ.*, 294 *N.J.Super.* 252, 260–61, 683 *A.2d* 212 (App.Div.1996), *certif. denied*, 148 *N.J.* 459, 690 *A.2d* 606 (1997) (quoting *Close v. Kordulak Bros.*, 44 *N.J.* 589, 599, 210 *A.2d* 753 (1965) (citation omitted)).

Concerning the statute of limitations, *N.J.S.A.* 34:15–34 provides that a claim must be filed "within 2 years after the date on which the claimant first knew the nature of the disability and its relation to the employment. ∴." Knowledge of the "nature" of a disability includes knowledge that the injury is compensable. *Panchak v. Simmons Co.*, 15 *N.J.* 13, 21, 103 *A.2d* 884 (1954). The definition of "compensable occupational disease" includes diseases "due in a material degree" to conditions characteristic of a particular place of employment. *Fiore v. Consolidated Freightways*, 140 *N.J.* 452, 469, 659 *A.2d* 436 (1995).

The compensation judge found that there was "some medical treatment, inconvenience and discomfort or evidence of the condition early on, but the disability or functional impairment [did] not become apparent until sometime later." The judge found Earl's situation to be analogous to that of the claimant in *Falcon v. American Cyanamid*, 221 *N.J.Super.* 252, 534 *A.2d* 403 (1987). Although Falcon had suffered periodic bladder infections since the 1950s, the compensation judge determined that Falcon did not

have a compensable claim until he was diagnosed with bladder cancer in 1980. That ruling was upheld. *Id.* at 259, 534 *A.*2d 403. Similarly, the judge here found that Earl, "while experiencing some personal discomfort which prompted her to seek medical care, did not have possession of the indicia of permanent loss of function" until she underwent pulmonary function tests (PFTs) in 1993.

The compensation judge's finding is adequately supported by the record. The respiratory infections, sinus infections and bronchitis that petitioner experienced beginning in 1988 did not indicate the onset of a permanent disability. Although Earl's two breathing attacks in 1989 and her physicians' subsequent diagnosis of asthma and COPD indicate that Earl had begun to experience chronic respiratory problems, she was still able to work. In fact, petitioner continued to work for Johnson & Johnson until 1993, and left the company to take advantage of an offer of early retirement.

After Earl was diagnosed with asthma and COPD in 1989, Earl's doctor instructed her to avoid stairs, dust, pollen, animals, and cutting grass, but did not advise her to seek any changes in her work environment. Earl apparently sought to decrease her time in the file room because of the immediate physical discomfort caused to her by the gypsum dust, rather than her knowledge of the onset of a permanent respiratory disability.

It was not until November 4, 1993 that Earl underwent PFTs. The PFTs disclosed that Earl had suffered a permanent loss of pulmonary function. Earl was first diagnosed with emphysema in January 1994. Later PFTs conducted in 1996 disclosed that Earl's disability had increased.

According to *N.J.S.A.* 34:15–36, permanent partial disability is

a permanent impairment caused by a compensable accident or compensable occupational disease, based upon demonstrable objective medical evidence, which restricts the function of the body or of its members or organs; included in the criteria which shall be considered shall be whether there has been a lessening to a

material degree of an employee's working ability ... occupational disease of a minor nature such as mild dermatitis and mild bronchitis shall not constitute permanent disability within the meaning of this definition.

As acknowledged by the Legislature in *N.J.S.A.* 34:15–36, minor respiratory conditions are not compensable. This is because many workers suffer from occasional bronchitis or mild asthma, with no significant effect on their ability to work or their quality of life. Such ailments do not necessarily degenerate into the serious and chronic problems now experienced by petitioner.

The Appellate Division held that petitioner knew the nature of her disability after her initial diagnosis and treatment in 1989. The Appellate Division's reasoning implies that once a worker has received some treatment for a work-related health problem, that worker will be deemed to have knowledge of the nature of the disability. However, as *N.J.S.A.* 34:15–36 specifies, it is possible to have a work-related health problem that is not sufficiently debilitating to be compensable. Earl's testimony indicated that she initially perceived her problems in that light. When asked about the 1989 diagnosis, Earl testified that her doctor was "treating me for my asthma" and "something to do with respiratory." These statements do not indicate that petitioner knew the nature of her disability. In *Bucuk v. Edward A. Zusi Brass Foundry,* 49 *N.J.Super.* 187, 212, 139 *A.*2d 436 (App.Div.), *certif. denied,* 27 *N.J.* 398, 143 *A.*2d 9 (1958), the court stated, " 'knowledge of the nature of [the] disability' connotes knowledge of the most notable characteristics of the disease, sufficient to bring home substantial realization of its extent and seriousness." Bucuk had been told that he had silicosis, but he had not been told what silicosis meant—that he suffered from a permanent debilitating condition of the lungs caused by exposure to silica that was, in his case, accompanied by emphysema. Accordingly, the Appellate Division upheld the County Court's determination that Bucuk did not know the nature of his disability.

"Occupational diseases are often of such an insidious nature that they do not become evident until years after exposure to the cause thereof." *Panzino v. Continental Can Co.,* 71 *N.J.* 298, 301, 364

*A.*2d 1043 (1976) (quoting Sponsor's Statement to *L.* 1974, *c.* 65). Pennsylvania courts have held that their statute of limitations for occupational disease "does not begin to run until 'pertinent medical diagnosis is completely established to the knowledge of the claimant' that [the] total disability is work related." *Price v. Workmen's Comp. Appeal Bd.,* 533 *Pa.* 500, 626 *A.*2d 114, 117 (1993) (quoting *Ciabattoni v. Birdsboro Steel Foundry & Mach. Co.,* 386 *Pa.* 179, 125 *A.*2d 365, 367 (1956)). The latter court reasoned that an occupational disease is distinguishable from an accident, because an accident "rises from a definite event, the time and place of which can be fixed, while [an occupational disease] develops gradually over a long period of time." *Ciabattoni, supra,* 125 *A.*2d at 368 (citations omitted). Our law does not go so far as to require an actual diagnosis, but the policy concerns are similar.

Although Earl's respiratory problems began in 1989, she did not undergo PFTs at that time. The compensation judge found that petitioner did not know that her condition had deteriorated into that of a permanent disability until the 1993 PFTs and accompanying medical diagnosis. Because the compensation court found that Earl did not know "the nature of the disability" until after her employment with Johnson & Johnson had ended in 1993, she filed her claim well within the statute of limitations.

### III

In view of our disposition of this case, we do not resolve the two other issues, namely, whether continuous exposure tolled the statute of limitations on occupationally-induced injury, and whether the provision of employee health benefits constituted the payment of medical benefits for the purposes of *N.J.S.A.* 34:15–34.

### A.

Petitioner's fall-back position was that even if she were found to have had knowledge of the nature of her disability more than two years before she filed her claim, the statute of limitations did not begin to run until the end of her employment because of her

continued exposure to pulmonary irritants. Petitioner relied on *Brooks v. Bethlehem Steel Co.*, 66 *N.J.Super.* 135, 138, 168 *A.*2d 670 (App.Div.), *certif. denied,* 36 *N.J.* 29, 174 *A.*2d 657 (1961), in which the court noted that a worker's claim for occupational disease was not barred by the statute of limitations "for the dispositive reason that petitioner was still employed by respondent in the same kind of work as allegedly produced the disability, and thus still exposed to the same occupational disease, at the time [claimant] filed the petition."

The question is whether *Brooks* remained the law after a 1974 amendment of the Workers' Compensation Act, currently codified at *N.J.S.A.* 34:15–1 to –142. It appears to be the administrative understanding of the workers' compensation bench and bar that claimants who wait until the end of their exposure to bring claims involving occupational disease will not be denied that opportunity on statute of limitations grounds, assuming that they bring their actions within two years after the cessation of exposure if they know the nature of the disability and its relation to the employment. In many work places, workers feel pressure not to file claims for workers' compensation while they are still employed. The culture of the work place discourages workers from filing claims because to do so is seen as an act of disloyalty to the employer. Despite statutes prohibiting discrimination against workers who bring claims, workers still fear that taking action means risking their jobs.

In its pre–1974 form, *N.J.S.A.* 34:15–34 "forever barred" any claim not presented within five years from the date of last exposure. *Panzino, supra,* 71 *N.J.* at 301, 364 *A.*2d 1043. The Legislature amended the statute to delete the five-year limit because "[e]xperience has revealed that by their very nature occupational diseases often do not become manifest until years after exposure." *Panzino, supra,* 71 *N.J.* at 302, 364 *A.*2d 1043. By honoring claims for occupational disease so long as claims are filed within two years of the claimant's discovery, the statute represents the Legislature's rejection of the prior "burdensome"

and "arbitrary" time restrictions. *Ibid.* In its current form, *N.J.S.A.* 34:15–34 provides:

> there shall be no time limitation upon the filing of claims for compensation for compensable occupational disease, as hereinabove defined; provided, however, that where a claimant knew the nature of the disability and its relation to the employment, all claims for compensation for compensable occupational disease except as herein provided shall be barred unless a petition is filed in duplicate with the secretary of the division in Trenton within 2 years after the date on which the claimant first knew the nature of the disability and its relation to the employment. . . .

Because of the pernicious nature of occupational diseases, the Legislature has been solicitous of workers who suffer from these ailments. Petitioner argued that it is unlikely that the Legislature would have intended to preclude a claim for an injury that had not yet occurred. Under a narrow interpretation of *N.J.S.A.* 34:15–34, workers who are aware that working conditions cause them to experience occasional breathing problems would be barred from bringing claims when, more than two years later, continued exposure results in emphysema. In *Mikitka v. Johns–Manville Products Corp.*, the court reasoned that it would be an "absurd result" to bar claims "before they even existed." 139 *N.J.Super.* 66, 72, 352 *A.*2d 591 (1976) (adopting rule that to know "nature of the disability" encompasses knowledge of both type and extent of disability when claimant suffers additional disability after original award). *See also Owens–Illinois Inc. v. United Ins. Co.*, 138 *N.J.* 437, 451, 650 *A.*2d 974 (1994) (discussing continuous-trigger theory that injury from environmental contaminants "occurs during each phase of environmental exposure").

█ This case, however, did not involve a finding of continuing exposure to the cause of occupational injury.[1] The employer insisted that once the worker was reassigned from the file room, she was no longer exposed. The workers' compensation judge did

---

[1] There is no issue before the Court regarding the requirement that the employer receive notice of the employee's claim under *N.J.S.A.* 34:15–33. For a discussion of the notice requirement, see *Brock v. Public Service Electric & Gas Co.*, 149 *N.J.* 378, 693 *A.*2d 894 (1997).

not find that there had been continuous exposure, and neither the judge nor the Appellate Division specifically interpreted this aspect of *N.J.S.A.* 34:15–34 in reaching their decisions. As noted by petitioner at oral argument and in the brief of *amici curiae* in support of petitioner, the Division has interpreted *N.J.S.A.* 34:15–34 "to provide an outside limit after exposure ends of two years from when the employee knew the nature of the occupationally related condition and its relationship to the employment. Such knowledge is immaterial in ongoing exposures for which a petitioner can file within two years from the last exposure." *Larison v. Atlantic States Cast Iron Pipe Co.,* No. 94–028570, Division of Workers' Compensation, Warren County District, Supplemental Decision (Oct. 16, 1998). Ordinarily, "[a]n administrative agency's interpretation of a statute it is charged with enforcing is entitled to great weight." *In re Application of Saddle River,* 71 *N.J.* 14, 24, 362 *A.*2d 552 (1976). No decision binding on the Division of Workers' Compensation has held that continued exposure does not toll the statute of limitations under *N.J.S.A.* 34:15–34. The Division is free to continue to apply its administrative understanding of the statute until such time as the issue is squarely presented to a court and that court explicitly addresses the Division's interpretation.

### B.

The remaining question is whether the statute of limitations on petitioner's claim was tolled by *N.J.S.A.* 34:15–34 because Earl had received compensation in the form of medical benefits through her employer-sponsored health plan within the two years prior to the filing of her workers' compensation claim. Under Johnson & Johnson's medical insurance plan, the company paid eighty percent of Earl's medical expenses, while Earl was responsible for co-payments equal to the remaining twenty percent. It does not appear that petitioner ever sought treatment from company physicians, or that she informed her health-care provider that her respiratory problems constituted a work-related injury.

In *Sheffield, supra,* the petitioner had not filed a claim for workers' compensation until five-and-a-half years after her back injuries rendered her unable to work. However, the petitioner had received private-plan disability benefits and medical benefits for her back symptoms from her former employer's insurers during that period. When the company's medical insurer delayed or denied payment of Sheffield's claims for medical benefits on the basis that the claims should have been submitted to a workers' compensation provider, the company's benefits department informed the medical insurer that Sheffield's back condition was not work-related and that the medical claims should be paid. Under these circumstances, the Court held, "the private-plan disability and medical benefits provided to Sheffield [by her employer] . . . constituted payments of compensation within the meaning of *N.J.S.A.* 34:15-34." *Sheffield, supra,* 146 *N.J.* at 458, 680 *A.*2d 750 (citations omitted).

 The Appellate Division interpreted *Sheffield* to require such tolling only when payments to employees are made "under circumstances such that they are reasonably capable of lulling the employee into refraining from filing a petition to claim his or her rights under the Workers' Compensation laws." 313 *N.J.Super.* at 310, 712 *A.*2d 1202. Petitioner claims that this is more than the *Sheffield* court required to toll the statute. The Court said, "it is widely accepted that a payment made to compensate for medical expenses incurred as a result of a work-related injury constitutes a payment of compensation that tolls the statutory period if the payment could have been required under the workers' compensation statute, regardless of" the source of the payment. *Sheffield, supra,* 146 *N.J.* at 459, 680 *A.*2d 750. On the other hand, the employer argues that the mere provision of medical or disability benefits to an employee for a work-related injury should not toll the statute of limitations. At a minimum, respondent insists that an employer should have been involved in some affirmative act that might have caused an employee not to file a potential claim. One thing is certain: "[W]hen an employer undertakes to advise

an injured employee to apply for certain disability or medical benefits that are authorized by the employer, the employer necessarily assumes a further obligation not to divert the employee from the remedies available under the Act." *Sheffield, supra,* 146 *N.J.* at 460, 680 *A.*2d 750. We emphasized in *Sheffield* that employers should be honest with their employees concerning which medical and disability benefits are available. A company that diverts an employee from the remedies available under the Act may be precluded from asserting the statutory bar by reason of its conduct. *Ibid.* Because of the disposition that we make, we shall await a record that requires our decision before further elaboration on the *Sheffield* doctrine.

We reverse the judgment of the Appellate Division and reinstate the judgment of the Division of Workers' Compensation.

*For reversal and reinstatement*—Chief Justice PORITZ and Justices HANDLER, O'HERN, STEIN, and COLEMAN—5.

*Opposed*—None.