827 A.2d 299

GEORGE ADAMS, PETITIONER–APPELLANT, v. THE NEW YORK GIANTS, RESPONDENT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued January 7, 2003—Decided July 3, 2003.

Before Judges COBURN, COLLESTER and ALLEY.

*Stanley R. Bright* argued the cause for appellant (*James D. Butler,* attorney; *Mr. Bright,* on the brief).

*James F. Supple* argued the cause for respondent (*Fitzpatrick, Reilly, Supple & Gaul,* attorneys; *Mr. Supple,* of counsel and on the brief).

The opinion of the court was delivered by

COLLESTER, J.A.D.

Appellant George Adams appeals from a final order of the Division of Workers' Compensation dismissing his employee claim petition for failure to file a claim within the two year statutory limitation period of *N.J.S.A.* 34:15–51. Adams filed his petition on July 25, 1996. The respondent, New York Giants (Giants), filed an answer along with a motion to dismiss the petition as time barred.

Thereafter, Adams filed for medical and temporary benefits seeking payment of past medical expenses for hip replacement surgery as well as future expenses for a second hip replacement. An evidentiary hearing was held on both Adams' application and the Giants' motion to dismiss on varying dates between January 21, 1999 and June 21, 2001. On January 29, 2002, the judge of compensation issued an order and written opinion dismissing the claim for lack of jurisdiction due to Adams' failure to file the petition within the time limitation of *N.J.S.A.* 34:15-51. Adams appeals from that order.

George Adams is a former National Football League running back, who was the number one draft choice of the Giants in 1985. He played for the Giants from 1985 through 1989 and for the New England Patriots (Patriots) until he was released following the first game of the 1991 regular season. The incident giving rise to his claim occurred during training camp with the Giants in August 1986, Adams' second season. During an intrasquad scrimmage Adams took a handoff to run the ball off tackle when a defensive lineman dove at his feet. Adams described the incident as follows:

> It was a stand up scrimmage. I ran through the line. I can still see the defensive lineman at full speed, even though it was a half speed drill. He came down the line and I was running. He dove and tripped me up. I was stumbling. I caught myself on one leg. I caught it on the left leg. I caught myself and it just snapped out. I fell down. My whole left side was numb. [Trainer Ron Barnes] and the team doctor [Dr. Russell F. Warren] ran out to me and they said, "George, what's wrong?" And I said, "I can't feel anything." ... So they picked me up, they took me back to the sideline. Then the feeling was coming back. The feeling start[ed] coming back after ten to fifteen minutes ... I didn't know how severe, but I knew I hurt myself.

Adams was treated for a hip flexor. He was prescribed anti-inflammatory medication, underwent electric stimulation therapy and was told to ride a stationary bike. During the remainder of training camp he participated in practice drills despite the pain. He played in the Giants last 1986 pre-season game, but removed himself after a brief time. He explained the circumstances as follows:

I tried to play the last pre-season game against the Jets. And Phil Simms threw me the ball and it went over my head, and I told Coach Parcells that I won't be able to do it.

This incident ended Adams' 1986 season. He was placed on the injured reserve list of the Giants but remained with the team throughout its championship season. During the season he continued under the care of Dr. Russell F. Warren, the Giants' team doctor and an orthopedic surgeon with the New York Hospital for Special Surgery. On November 6, 1986, Dr. Warren reported the following findings and observations:

It was noted on examination at [the time of the injury] he had pain with abduction of his hip and some pain with flexion of his hip. There was no pain behind the hip or posteriorly. On subsequent evaluations he continued to have discomfort in his left hip. X-rays were obtained which initially were non-revealing. [Plaintiff's] complaints continued; they seemed to respond to rest with pain quieting down. However, with renewed activity the pain would increase. Bone scan was obtained in August, which showed a diffuse increased activity in the left hip region. Subsequently, a CAT scan demonstrated an evulsion injury in the posterior region of the acetabulum [of] the left hip. No lesion of the femoral head was seen. MRI demonstrated triangular defect in the femoral head. Patient was restricted in his activity. He was placed on anti-inflammatories. MRI was also suggestive of significant synovitis. He was then placed on crutches, as well as Indocin. Repeat MRI's taken in September and beginning of November again showed the triangular defect in the left femoral head. The synovitis reaction appears to have diminished significantly. In early September, the patient had some discomfort in his hip, which was responsive to Indocin. Now on weightbearing. Subsequently, his hip has quieted down. Range of motion has gradually returned to normal. Minimal discomfort with extremes of motion. I have had Dr. Paul Pellicci evaluate George in September, and reviewed the MRI's subsequently with Dr. Schneider and myself. It was noted that there is no pain in the posterior aspect of the acetabulum in September, which was somewhat confusing since it appeared the x-ray showed a[n] evulsion injury in the posterior region of the acetabulum. ... It was puzzling as to why there was minimal pain in the posterior region of the acetabulum, and most of the pain in the anterior aspect. Overall, it appears that he has sustained a transient subluxation of his hip resulting in the evulsion, within a fraction of his femoral head with some degree of necrosis being present.

George Adams reported to the Giants training camp in 1987 and passed the team physical. He played for the Giants during the 1987 strike-shortened season as well as the full seasons of 1988 and 1989. During those seasons he said his hip did not get any better or any worse. He testified that he functioned at only about seventy-five to eighty percent of his former athletic capacity.

Giants trainer Ron Barnes and Dr. Warren continued to check his hip throughout the time he remained with the Giants. Adams said that Dr. Warren told him that his hip condition would stay the same.

After the 1989 season, George Adams' contract with the Giants expired, making him a Plan B free agent. Shortly before training camp in the summer of 1990, he signed with the Patriots. After being examined by their medical staff and reviewing Dr. Warren's report, the Patriots' management was sufficiently concerned about the condition of Adams' left hip to require him to sign a waiver, releasing the Patriots from liability in the event of further injury to the hip. After playing the full 1990 season with the Patriots, Adams was released after the first regular season game in 1991. In his words it was for "lack of ability to get the job done. I was not 100 percent."

Following his release by the Patriots, Adams retired from professional football. He moved to Texas because his "hip does better in warm weather." After an unsuccessful attempt to launch his own trucking and delivery business, he took a job with Bell Helicopter in 1993 as an employee assistance representative. His duties included performing personal counseling services relating to drug abuse, alcohol abuse, financial stress, depression and other problems for employees and their families.

By 1995, having abandoned the strict treatment regimen he practiced as a professional football player, Adams' hip condition significantly worsened. Only thirty-two, he had trouble getting out of bed because of the pain and often had to sit at the edge of the bed for a time before he could stand up. The pain in his left hip was constant, especially when walking or getting out of a chair. The pain finally led him to Dr. Richard E. Jones of the Southwest Orthopedic Institute on August 2, 1995.

Dr. Jones diagnosed Adams with traumatic arthrosis of the left hip with osteonecrosis, which is the gradual disintegration of the hip joint. As explained to Adams, the hip joint is nourished mainly by a small artery that stems from inside the hip socket to

the head of the femoral. In Adams' case this artery was destroyed as a result of a severe subluxation. When this happens, the head of the femoral does not have sufficient nutrition, and the bone tissue dies, causing a gradual and untreatable degeneration of the hip joint.

Dr. Jones placed Adams on a stationary bike and fluid exercise program for two months and then reevaluated the hip. Since the treatment did not alleviate the pain, Dr. Jones recommended a left side total hip replacement, known as a total hip arthroplasty. The procedure is basically a replacement of the hip ball and socket. The new socket is made of metal with a plastic lining on the inside, and the socket fits into a "ball" made of stainless steel with a steel "pole" that is hammered downward through a hole drilled out in the center of the femur and cemented in place.

Adams' total hip arthroplasty was ultimately unsuccessful in alleviating his pain and his inability to function at work. A bone scan revealed a loosening of the arthroplasty because the prothesis was unable to accommodate Adams' large frame of 6'2" and 250 pounds. The weight placed on the femur eventually caused the cemented pole to loosen. As a result, with every step Adams took the steel pole jammed into the femur bone, which in turn caused inflammation of the surrounding muscles and significant pain. Dr. Jones recommended a second surgery to rectify the condition by use of a larger prothesis extending further into the femur to withstand the stress of Adams' body frame.

Adams filed his claim petition against the Giants on July 25, 1996, about a month after his initial surgery.[1] When Dr. Jones told him that a second hip arthroplasty was necessary, he filed a motion for medical and temporary benefits in September 1998.

During the evidentiary hearing, the judge of compensation heard testimony from Adams, Dr. Edwin Turner, who testified on

---

[1] Adams also filed a claim petition against the Patriots on June 19, 1996, which was dismissed on December 14, 2000, on grounds of lack of jurisdiction in New Jersey.

behalf of Adams, and Dr. Arthur T. Canario, who testified for the Giants. Medical reports and evaluations of Dr. Warren relating to Adams' treatment during his time with the Giants were reviewed as well as medical reports before and after the hip replacement surgery.[2] There was agreement that the incident at the 1986 Giants training camp was the direct and sole cause of Adams' problem and that further surgery was necessary to alleviate his pain and limitation of mobility.

Both Dr. Turner and Dr. Canario testified that when there is a severe subluxation of the hip so that the small artery from inside the socket to the head of the femur is destroyed, bone tissue dies. Furthermore, when such an injury occurs, it is difficult to predict the outcome. At times through continued use, the patient will develop some collateral circulation to slow down the necrosis. As reported by Dr. Warren, necrosis was present in the hip joint while Adams was with the Giants. By 1998 the joint space was narrowing, indicating that the joint was beginning to disintegrate.

No treatment can stop the disintegration once it has begun, and in Adams' case the disintegration was pronounced. After surgery in 1996, he walked with a pronounced limp and needed a cane for mobility. He testified to constant pain from his lower back and left hip down to his left knee. He quit his job at Bell Helicopter in April 2000, because he was unable to walk around the expansive plant to perform his duties.

The judge of compensation determined that Adams' injury was the result of an "accident" rather than an occupational disease and that his petition was governed by the two year limitation period of *N.J.S.A.* 34:15–51. She stated:

> No evidence has been adduced that this injury was caused in any way by occupational exposure. Essentially, occupational exposure cases involve situations

---

[2] On appeal, the Giants moved to introduce medical reports of the medical staff of the Patriots that were marked for identification at the hearing. Adams objected on grounds that the reports were not marked into evidence. We have decided that the reports are unnecessary to our determination and have not considered them.

where the petitioner is either unaware of the cause of his disability or unaware that he has a disability until after the statute has run. We are not dealing here with a disease that has multiple potential causes, one of which could be work-related. This was a simple cause and effect. Petitioner was acutely aware when the injury happened. We are not dealing with a disease that did not manifest until years later. Petitioner's problem was immediate and intense. Although the extreme pain seems to have been brought under some control after a year of therapy, petitioner admitted that he still had pain, he still received medication and therapy, and that he continued to follow the rigorous exercise program that was prescribed for him. Physically, his hip injury prevented him from performing on the field the way he had before. This led to his release from the Patriots.

The compensation judge found support for these findings in the unrebutted testimony of Dr. Canario, who described the effect of Adams' injury as follows:

It was a transient subluxation. It resulted in an inflammatory process and eventually arthritis and the need for the total hip replacement. It was my opinion that the injury was causative of this, and if the injury did not occur, it would not have been the arthritis that developed and the need for the total hip replacement. I did not feel that it was an occupational claim, but it was directly related to that incident. Once the incident occurred he would have wound up with a total hip replacement if he played football or if he did not.

The so-called "accident" period of limitations provides that the petition for compensation must be filed within two years of the date of accident. *N.J.S.A.* 34:15–41 states:

In case of personal injury or death all claims for compensation on account thereof shall be forever barred unless a petition is filed in duplicate with the secretary of the workmen's compensation bureau, as prescribed by section 34:15-51 of this title.

.*N.J.S.A.* 34:15–51 states, in pertinent part:

Every claimant for compensation under Article 2 of this chapter § 34:15-7 *et seq.* Shall, unless a settlement is effected or a petition filed under the provisions of 34:15-50 of this Title, file a petition in duplicate with the division in Trenton, within 2 years after the date on which the accident occurred. . . .

In contrast, the occupational disease statute of limitations, *N.J.S.A.* 34:15–34, provides that a petition must be filed within two years of the date when the petitioner first knew of the disability and its relation to his employment. *N.J.S.A.* 34:15–34 states in pertinent part:

Notwithstanding the time limitation for the filing of claims for compensation as set forth in sections 34:15-41 and 34:15-51, or as set forth in any other section of this Title, there shall be no time limitation upon the filing of claims for compensation for compensable occupational disease, as hereinabove defined; provided, however,

that were a claimant knew the nature of the disability and its relation to the employment, all claims for compensation for compensable occupational disease except as herein provided shall be barred unless a petition is filed in duplicate with the secretary of the division in Trenton within 2 years after the date on which the claimant first knew the nature of the disability and its relation to the employment. . . .

Adams argues that the nature and progression of his injury demonstrates that it was not the result of an "accident," but was rather an initial trauma exacerbated by repetitive physical trauma to the left hip, which caused a "pathological process that is within the realm of an occupational disease" under *N.J.S.A.* 34:15–34. Adams claims that he did not know the nature of his disability until 1995 when he was first advised of the extent and seriousness of his injury and the for a hip replacement. He therefore argues that his petition was filed within the time prescribed by *N.J.S.A.* 34:15–34.

Adams relies upon *Earl v. Johnson & Johnson*, 158 *N.J.* 155, 728 *A.*2d 820 (1999), in which the Supreme Court held that a claimant, who was aware of a work-related illness but unaware of the extent of her permanent loss of respiratory function until she underwent pulmonary functionary tests, was not subject to the two year "accident" bar of *N.J.S.A.* 34:15–51. The claimant was a clerical employee who worked in a poorly ventilated room invaded by a powder which irritated her upper respiratory tract. She developed pulmonary symptoms from repetitive exposure over a four year period, which eventually resulted in emphysema. She was aware of respiratory problems related to her work environment as early as 1989, but unaware of the extent of her condition until she filed her petition in 1993. The Supreme Court held that her claim was not time barred by *N.J.S.A.* 34:15–51 since the petitioner did not know the nature of her disability caused by her occupational disease until after the two year period had passed so that her petition was properly filed within the permissible time period of *N.J.S.A.* 34:15–34. *See also, Bucuk v. Edward A. Zusi Brass Foundry*, 49 *N.J.Super.* 187, 206, 139 *A.*2d 436 (App.Div. 1958); *Mikitka v. Johns–Manville Products Corp.*, 139 *N.J.Super.* 66, 352 *A.*2d 591 (App.Div.1976).

Petitioner argues that he was unaware of the nature and extent of the initial trauma as well as the effect of successive traumas common to a football player during the remaining years of his professional career. He claims his case is governed by *Earl* and falls within the limitation confines of *N.J.S.A.* 34:15–34 since he knew his working conditions caused an injury resulting in pain and limitation of motion, but he did not consider himself as disabled and certainly did not comprehend that his injury could result in a hip replacement. He also contends that since minor occupational conditions are not compensable under *N.J.S.A.* 34:15–36, his condition of traumatic arthrosis with left hip osteonecrosis would not have been compensable two years after the initial trauma because the condition had not yet degenerated to the status of a partial permanent injury.

In *Earl*, the Supreme Court considered the distinction between a compensable "occupational disease" limited by two years after its discovery and the "accident" statute governed by the two year bar of *N.J.S.A.* 34:15–51. The Court stated: "an occupational disease is distinguishable from an accident, because an accident 'rises from a definite event, the time and place of which can be fixed, while [an occupational disease] develops gradually over a long period of time.'" *Earl, supra,* 158 *N.J.* at 164, 728 *A.*2d 820 (quoting *Ciabattoni v. Birdsboro Steel Foundry & Mach. Co.,* 386 *Pa.* 179, 125 *A.*2d 365, 367 (1956)); *see also,* 2 *Larson's Workers' Compensation Law,* § 42.02 at 42–6.

Recently, in *Brunell v. Wildwood Crest Police Dept.,* 176 *N.J.* 225, 822 *A.*2d 576 (2003), the Supreme Court had occasion again to consider the "accidental injury" and "occupational disease" dichotomy. The case considered two claims for workers' compensation, one by a police officer and the other by a police dispatcher, based on post-traumatic stress disorder (PTSD) with alleged delayed onset. In both instances, the claimed PTSD had a traumatic event as its trigger, but the diagnosis was not made until more than two years after the precipitating event. The Supreme Court reversed the dismissal of the petitions based on the "accident"

limitation of *N.J.S.A.* 34:15–51. The Court described "a narrow band" of accident cases in which there are "latent and insidiously progressive conditions that ordinarily mark an occupational disease." *Brunell, supra,* at 260, 822 *A.*2d 576. With respect to this "narrow class of cases" of latent injury accidents, the Court stated that the statutory purpose of the Workers' Compensation Act would negate foreclosing a legitimately injured worker from filing a claim after the two year period until he knew or reasonably could have known that his injury was compensable, as specified in *N.J.S.A.* 34:15–34. *Id.* at 261, 822 *A.*2d 576. The court concluded:

> We are, therefore, satisfied that in the limited class of cases in which an unexpected traumatic event occurs and the injury it generates is latent or insidiously progressive, an accident for workers' compensation filing purposes has not taken place until the signs and symptoms are such that they would alert a reasonable person that he had sustained a compensable injury.
>
> [*Id.* at 254, 822 *A.*2d 576.]

We hold that Adams does not fall within the narrow class of cases which *Brunell* denotes as accident cases calling for application of the discovery rule. *N.J.S.A.* 34:15–34. According to his own testimony, Adams knew that he suffered a serious injury right after the play in the August 1986 Giants training camp. The serious nature was underscored by the fact that he was unable to play for the entire 1986 season and was only able to perform at the level of seventy-five to eighty percent of his prior athletic ability during the remainder of his football career. Moreover, after his football career ended, Adams' hip pain and limited mobility accelerated. Nonetheless, he did not file his petition for workers' compensation until July 1996, five years after his football career ended and ten years after he suffered his hip injury in the Giants' training camp.

In *Brunell,* the two petitioners alleged that their respective PTSD conditions were delayed in onset from the triggering traumatic event to four years in one case and six in the other and that they were, therefore, unaware that they suffered a compensable injury until well after the two year limitation period for an accidental injury had expired. However, in the instant case, while

Adams clearly did not anticipate the severity of his disability ten years after the accident, he either was aware or, as a reasonable person, should have been aware of the disabling nature, seriousness and probable compensable character of his injury well before two years preceding his filing of a claim for compensation. As stated in *Brunell,*

> That is not to suggest a wholesale importation of the discovery rule that is a part of the occupational disease statute into all accidental injury cases. Notice and claim limitations in classic industrial accidents involving simultaneous traumatic event and injury will continue to be calculated from the date of the traumatic event. It is only in the narrow band of accident cases involving latency and insidious onset diseases that we think the Legislature would have intended the kind of leeway it developed to avoid a legitimately injured worker losing an occupational claim to be equally applicable to latent injury accidents.
>
> Moreover, it should be noted that applying a discovery-type rule to that narrow class of accident cases will not result in the obliteration of the distinction between accidental injury and occupational disease for notice and filing purposes. It remains the fact that the accident calculation begins when the worker knows or should know he has incurred any compensable injury (for example, medical bills, temporary disability, or permanent disability). On the contrary, the occupational disease clock does not begin to run until the worker knows the true nature and seriousness of the disability. *Earl, supra,* 158 *N.J.* at 161, 728, *A.2d* 820. That distinction gives the worker more latitude in notifying the employer and filing a claim based on occupational disease, presumably because there the employer could have anticipated such a disease as a natural hazard of the job. Less latitude is afforded the worker who is injured in an unexpected accident. Once he knows he has sustained any compensable injury, he must act.
>
> [*Id.* at 261, 822 *A.2d* 576.]

We hold that Adams' injury was not in the nature of an occupational disease, but rather an accidental injury, and it does not fit within the limited band of accidental cases described in *Brunell* as having "latent and insidiously progressive conditions that ordinarily mark an occupational disease." *Id.* at 260, 822 *A.2d* 576. We therefore affirm the dismissal of the claim petition for lack of jurisdiction based on non-compliance with *N.J.S.A.* 34:15–51.

Affirmed.